[No. A092213. First Dist., Div. One. May 31, 2002.]

SHIRLEY HACKETT, Plaintiff and Appellant, v.
JOHN CRANE, INC., Defendant and Appellant.

[No. A093411. First Dist., Div. One. May 31, 2002.]

SHIRLEY HACKETT, Plaintiff and Respondent, v
JOHN CRANE, INC., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.A., II.B., II.C. and II.E.

1234

COUNSEL

Law Offices of Daniel U. Smith, Daniel U. Smith; Wartnick, Chaber, Harowitz & Tigerman, Harry F. Wartnick and Stephen M. Tigerman for Plaintiff and Appellant and for Plaintiff and Respondent.

Hassard Bonnington, Philip S. Ward and Helene E. Swanson for Defendant and Appellant.

OPINION

**MARGULIES, J.**—A jury awarded plaintiffs Mark Lewis and his wife, Shirley Hackett, $2.3 million in damages arising from Lewis's shipyard exposure to asbestos products manufactured by John Crane, Inc. (Crane).[1] Crane seeks reversal of the judgment, contending that it resulted from jury misconduct, prejudicial errors in the admission of evidence, and an improper special verdict form. In the alternative, Crane contends that the trial court miscalculated the amount of the offset it was entitled to for plaintiffs' preverdict settlements and improperly awarded expert witness fees to Ms. Hackett. Plaintiffs cross-appeal, asserting that Crane's settlement offset was overstated.

We modify the judgment to reduce Crane's settlement credit against Lewis's economic damages by $33,367 and affirm it in all other respects. We also affirm the order awarding expert witness fees.

## I. BACKGROUND

Lewis worked for the Navy at the Mare Island Naval Shipyard from 1971 until 1995. From 1971 to 1977 he was employed as a pipefitter working on nuclear submarines and surface craft. From 1977 until 1987 he worked as a quality assurance inspector in the nuclear inspection division. Between 1987 and 1995 he worked as an inspector leader, and then as a supervisor in the inspection division.

Lewis's duties as a pipefitter included removing and replacing asbestos-containing packing materials used to seal valves and gaskets used to seal pipe joints. Such tasks were routinely performed as part of the process of overhauling submarines and surface vessels brought to Mare Island. As an inspector and supervisor, Lewis was present from time to time observing others removing and installing asbestos-containing packing materials and

---

[1]Plaintiff Lewis died before the present appeal was initiated. To maintain consistency, we refer to plaintiffs in the plural form when discussing the proceedings on appeal as well as those in the trial court.

gaskets. While working as a pipefitter, Lewis also handled asbestos-containing thermal insulation materials and worked alongside insulators who were removing and applying such materials to pipes. Much of the pipefitting and insulation work took place in confined spaces where pipefitters and insulators worked in close proximity. Lewis did not wear a respirator or protective clothing. Mr. Lewis smoked cigarettes for 29 years, quitting in 1994.

Crane sold asbestos packing materials and gaskets to the Navy. Crane's products were commonly used at Mare Island and were present in ships on which Lewis worked. There was testimony that Crane's packing products were the predominant brand of packing used at Mare Island. Lewis was also exposed to asbestos-containing packing materials, gaskets, and insulation furnished by many other manufacturers, including Garlock, Owens-Corning, and Johns-Manville.

Lewis began to exhibit symptoms of lung disease in April 1998. Diagnostic tests indicated that Lewis had mesothelioma, an invariably fatal form of cancer caused by asbestos exposure. Medical experts and treating physicians called by Lewis testified that they believed Lewis had mesothelioma to a high degree of medical certainty. More invasive tests that could have definitively established this diagnosis were not performed because the cancer had progressed so far that the risks associated with such tests outweighed the benefits.

At the time of his diagnosis, Lewis was 50 years old. He had been married to Shirley Hackett for 16 years. Lewis and Hackett had an eight-year-old son, and Lewis also had a 25-year-old son by a prior marriage.

Lewis and Hackett sued Crane and dozens of other companies involved in the use, distribution, or manufacturing of asbestos-containing products, seeking damages for Lewis's personal injury and Hackett's loss of consortium. Prior to trial, plaintiffs settled with more than 30 of the defendants for sums totaling $4,592,248. The settlement agreements included language purporting to release the settling defendants from all claims arising from Lewis's exposure to asbestos, including potential future wrongful death claims by his heirs, and an undertaking by Lewis to hold such defendants harmless from any loss or damage caused by the bringing of such claims.

Plaintiffs proceeded to a jury trial against Crane on the theory that its asbestos-containing products were defective in design in that they failed to meet the ordinary consumer's expectation of safety and were a substantial factor in causing Lewis's illness. Crane presented testimony disputing Lewis's evidence that his illness was asbestos-related mesothelioma, and

disputing whether Crane's products were unsafe or could have been a substantial source of Lewis's asbestos exposure.

After a five-week trial, the jury found Crane liable and determined that Lewis had incurred $1,696,132 in economic damages and $2 million in noneconomic damages as a result of his illness. Hackett's noneconomic damages for loss of consortium were found to be $1.25 million. The jury determined that Crane's comparative fault for plaintiffs' noneconomic damages was 18.5 percent. Crane's motions for a new trial and for judgment notwithstanding the verdict were denied. The trial court ruled that Crane was entitled to a credit of $1,072,657 against Lewis's economic damages based on plaintiffs' preverdict settlements.

Crane timely appealed from the judgment and ensuing orders (A092213), and filed a separate appeal (A093411) from a posttrial order awarding expert witness fees to Hackett. Plaintiffs cross-appealed in A092213 from the order establishing Crane's settlement credit. Before the close of briefing, we consolidated the appeals and cross-appeal for oral argument and decision.

## II. Discussion

### A.-C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### D. *Calculation of Settlement Credit*

The jury awarded Lewis $1,696,132 in economic damages for lost income and medical expenses. After trial, plaintiffs moved for an order determining how much of the preverdict settlement funds plaintiffs received from other defendants should be offset against Crane's liability for Lewis's economic damages. Both parties appeal from the resulting order.

 Crane contends that the trial court attributed too high a portion of the settlement to potential wrongful death claims of Lewis's heirs, thereby understating the credit to which it is entitled. Plaintiffs argue the court followed the wrong formula and attributed too little of the settlement to Shirley Hackett's loss of consortium claim, thereby overstating Crane's credit. We find merit in plaintiffs' position.

*Background*

In addition to the economic damages awarded to Lewis in this case, the jury also awarded Lewis noneconomic damages of $2 million for his pain

*See footnote, *ante*, page 1233.

and suffering and awarded his spouse, Shirley Hackett, $1.25 million in noneconomic damages for her loss of consortium damages incurred between the time of Lewis's diagnosis and his death.

Civil Code section 1431.2, subdivision (a), provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." This section, enacted by the voters in 1986 as part of Proposition 51, has been held applicable to strict liability asbestos exposure cases. (See *Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 852-859 [97 Cal.Rptr.2d 240] (*Wilson*); *Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1197 [74 Cal.Rptr.2d 580].)

Under Proposition 51, Crane is jointly and severally liable for the full amount of Lewis's economic damages along with all other defendants found to be at fault. However, as to Lewis's and Hackett's combined noneconomic award of $3.25 million, Crane is liable only to the extent of its percentage share of comparative fault as determined by the jury, 18.5 percent.

Prior to trial, Lewis and Hackett entered into a series of settlement agreements with other defendants. These agreements purported to settle any and all claims arising from Lewis's exposure to asbestos, including Lewis's personal injury claims, Hackett's loss of consortium claims, and any wrongful death claims that might be brought against the settling defendants in the future by Hackett and by Lewis's two sons. None of the settlement agreements allocated the total amount to be paid between economic and noneconomic damages or among the different potential claimants. With the exception of a single settlement agreement signed by Lewis's older son, Lewis's children did not sign the agreements. However, the settlements included agreements whereby Lewis and Hackett, for themselves and their estates, promised to hold the settling defendants harmless against any potential wrongful death claims brought by Lewis's heirs.

Under Code of Civil Procedure section 877, Crane was entitled to a credit against its liability for Lewis's economic damages for any portion of plaintiffs' settlement proceeds that were properly attributable to Lewis's economic damages claims. (See *Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 271-277 [11 Cal.Rptr.2d 498] (*Espinoza*).) *Espinoza* was a personal

injury case in which one of the codefendants settled before trial for the payment of an amount not allocated between the plaintiff's economic losses and his noneconomic, pain and suffering claim. The plaintiff then obtained a judgment against a nonsettling defendant. Economic damages comprised 29 percent of the total judgment. The Court of Appeal held that for purposes of calculating the credit the nonsettling defendant was entitled to for the plaintiff's economic damages, 29 percent of the settlement should be attributed to economic damages to mirror the fact finder's apportionment of damages. (*Id.* at pp. 276-277.) The *Espinoza* approach to allocating preverdict settlements is now well established. (*Ehret v. Congoleum Corp.* (1999) 73 Cal.App.4th 1308, 1320 [87 Cal.Rptr.2d 363].)

*Espinoza, supra,* 9 Cal.App.4th 268 is easy to apply when the claims that are settled and the claims that proceed to trial against the nonsettling defendants are identical personal injury claims. In our case, the settlements and verdict encompassed overlapping but not identical damages. The settlements covered the heirs' potential future wrongful death claims, which were not part of the trial, and also covered the spouse's predeath loss of consortium claim. How these complicating factors affect the calculation of a settlement credit was addressed in *Wilson, supra,* 81 Cal.App.4th at page 864 in a factual settling closely resembling the present case.

*Wilson, supra,* 81 Cal.Appl.4th 847 was an asbestos exposure case in which the jury had rendered a verdict against Crane for damages based on the husband's personal injury damages and the wife's loss of consortium. Preverdict settlements reached with other defendants purported to encompass the husband's personal injury claims, the wife's loss of consortium claim, and the potential future wrongful death claims of the heirs. The trial court had accepted as reasonable the following allocation of the plaintiff's $1.16 million pretrial settlement with other defendants: 60 percent to husband's personal injury claims, 20 percent to wife's loss of consortium claim, and 20 percent to potential future wrongful death claims by husband's heirs. As in this case, the parties disputed the proper method of calculating a credit for economic damages. (*Id.* pp. 859, 860-866.)

*Wilson* held that the credit should be calculated as follows (see *Wilson, supra,* 81 Cal.App.4th at p. 864, fn. 18): First, excluding the wife's loss of consortium damages, determine the ratio of economic to total damages as awarded by the jury. Second, subtract from the amount of the pretrial settlement the portions of the settlement properly found to be allocable to the wife's loss of consortium claim and the heirs' potential wrongful death claims. Third, multiply the two figures together to determine the amount of the defendant's settlement credit for economic damages.

The trial court followed the *Wilson* methodology in this case. First, it determined that the ratio of economic to total damages awarded to Lewis was 0.458. Then it determined that 34 percent of the pretrial settlement amount was properly allocable to the heirs' potential future wrongful death claims, and 15 percent was allocable to Hackett's loss of consortium claim. After subtracting these amounts from plaintiffs' settlement proceeds of $4,592,248 and multiplying the remainder by 0.458, the court computed that Crane was entitled to a settlement credit of $1,072,657 against economic damages and reduced the judgment amount accordingly.

*Allocation to Wrongful Death Claims*

Crane does not challenge the use of the *Wilson* formula (*Wilson, supra,* 81 Cal.App.4th at p. 864, fn. 18), but argues that the trial court's allocation of 34 percent of the settlement total ($1,561,364) to potential wrongful death claims was excessive. Its sole argument in this regard is that the court failed to take into account that Lewis's sons are not signatories to the settlement agreements and are therefore effectively free to pursue wrongful death claims against the settling defendants in the future. If so, then little if any of the consideration paid to Lewis and Hackett in settlement should have been allocated to the sons' claims.

We are unpersuaded by this argument. Lewis entered into hold harmless agreements with the settling defendants on behalf of himself and his estate. Although it is theoretically possible that the sons could sue *and* that no settlement proceeds would be left to fulfill the hold harmless agreements *and* that the defendants would not prevail under any one of several possible grounds for claiming an offset, it is plain that the settling defendants did not believe they were paying $4.5 million for an empty promise. The agreements make it clear that the settling defendants believed and expected there would be no future claims by the heirs. Crane advanced a similar contention in the *Wilson* case. The court was not sufficiently troubled by the remote possibility of a suit by the heirs to reject the plaintiffs' allocation of 20 percent of the settlement in that case to wrongful death claims. (*Wilson, supra,* 81 Cal.App.4th at pp. 862-863.)

Here, there was ample evidence in the record to support the trial court's allocation of 34 percent of the settlement to the heirs' potential future wrongful death claims. The trial court noted that Lewis was a kind and attentive father and that he had a close relationship with his wife and sons. One of his sons was only nine years old when Lewis died. Lewis's life expectancy was shortened by approximately 26 years as a result of his disease. As plaintiffs pointed out to the trial court, allocations of 50 to 70 percent of prior settlements to wrongful death claims were not uncommon in

cases brought by much older plaintiffs and by plaintiffs with no minor children. (See, e.g., *Overly v. Ingalls Shipbuilding, Inc.* (1999) 74 Cal.App.4th 164 [87 Cal.Rptr.2d 626] [upholding 50 percent allocation for worker diagnosed at age 73 with no minor children].)

■ The trial court has wide discretion in allocating portions of a prior settlement to claims not adjudicated at trial. (See *North County Contractor's Assn. v. Touchstone Ins. Services* (1994) 27 Cal.App.4th 1085, 1095 [33 Cal.Rptr.2d 166].) ■ On the record before us, allocating 34 percent of the prior settlement amount to the heirs' potential wrongful death claims is not an abuse of discretion.

*Plaintiffs' Cross-appeal*

■ Plaintiffs assert that the settlement credit given to Crane is overstated by $42,025. Contrary to Crane's contention, we find that plaintiffs expressly reserved their right to pursue this contention on appeal.

According to plaintiffs, the *Wilson* formula (*Wilson, supra,* 81 Cal.App.4th at p. 864, fn. 18) utilized by the trial court here incorrectly excludes loss of consortium damages, both in calculating the ratio of economic to total damages awarded by the jury, and in determining the portion of prior settlements to which that ratio applies. Plaintiffs contend that the correct ratio of economic to total damages awarded by the jury is 0.34, based on including loss of consortium as part of total damages in the denominator. To correctly compute Crane's settlement credit for economic damages, this percentage must be multiplied by $3,030,884 (the total of the prior settlements less the amount the trial court attributed to the heirs' potential wrongful death claims).

We conclude that *both* plaintiffs' proposed formula *and* the *Wilson* formula are correct and yield identical results if the amount of the settlement attributable to loss of consortium damages is correctly determined in light of the *Espinoza* line of cases. As explained below, we calculate that Crane's settlement credit for economic damages was overstated by $33,367.[12]

*Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831 [41 Cal.Rptr.2d 561] (*Greathouse*) involved wrongful death claims by the wife and children of a construction contractor who had died of an asbestos-related disease. Prior to trial, the heirs settled with all but one of the defendants. The

---

[12]The net settlement credit we calculate is nearly $9,000 higher than that calculated by plaintiffs. Plaintiffs round the economic damages ratio down from 0.3429 to 0.34. When applied to a multimillion-dollar settlement, this slight percentage difference produces too large a difference in the settlement credit to ignore.

settlement agreements prepared by the plaintiffs' counsel purported to allocate 80 percent of the preverdict settlements to noneconomic damages and only 20 percent to economic damages. In contrast, the jury's later damage award against the nonsettling defendant consisted of 74.3 percent economic damages for the heirs and 25.7 percent noneconomic damages. Despite the jury's verdict, the trial court granted the plaintiffs' motion to allocate the preverdict settlements according to the percentages recited in the agreements.

We held that this was error because plaintiffs' allocation motion asked the trial court to rule on an issue that had already been decided by the jury: "By allocating the 'total amount of damages' between economic and noneconomic damages, the jury made a determination as to the economic or noneconomic character of the indivisible injury which was directly applicable to the portion of the damages paid under the pretrial settlement. [¶] . . . [T]he trial court was justified in inquiring only if there was a reasonable basis for the jury's allocation of total damages between economic and noneconomic damages. [Citation.] If the allocation was supported by substantial evidence, it should have allocated the settlement proceeds between economic and noneconomic damages according to the proportion reflected in the jury's verdict. Any other allocation would necessarily infringe on the factfinding power of the jury. [Citation.]" (*Greathouse, supra,* 35 Cal.App.4th at pp. 840-841.)

In *Wilson,* the defendant took the position, citing *Espinoza, supra,* 9 Cal.App.4th 268 and *Greathouse, supra,* 35 Cal.App.4th 831, that the amount of the settlement attributable to loss of consortium should be based on the jury's award of loss of consortium damages, not on the trial court's independent determination of the amount. (*Wilson, supra,* 81 Cal.App.4th at pp. 863-866.) The *Wilson* court did not reach this issue because it found that the side advancing it (ironically, the same party opposing it in this case) would not benefit by its application. (*Id.* at p. 866.) We do reach the issue and agree with plaintiffs that Crane's settlement credit was overstated to their detriment because the trial court made its own estimate of loss of consortium damages rather than relying on the percentage reflected in the jury's verdict.

Crane points out that no case has held that the allocation of a prior settlement to a spouse's loss of consortium claim must be in exact proportion to the jury's award of loss of consortium damages. However, that is a distinction without a difference. Loss of consortium is simply a label for one type of noneconomic damages. As long as claims for such damages were encompassed by the prior settlements and the amount of the damages were

determined by the fact finder, they are logically indistinguishable from any other noneconomic damages for purposes of applying *Espinoza, supra,* 9 Cal.App.4th 268.

Of the total damages caused by Lewis's personal injury, the jury attributed 34.29 percent to economic damages and 65.71 percent to noneconomic damages, however labeled. As the parties recognize, simply taking 34.29 percent of the full amount of prior settlements as the allowable credit against Crane's economic damages liability would overstate the credit. The settlements include amounts attributable to the value of the heirs' potential wrongful death claims. These claims were not tried to the jury and nothing in the jury's verdict reflects upon their value relative to Lewis's economic damages. Thus, the trial court correctly adjusted the amount of the settlement by subtracting its estimate of the percentage allocable to the heirs' potential wrongful death claims (34 percent of the total settlement) before calculating Crane's settlement credit. As discussed above, the trial court did not abuse its discretion in attributing a settlement value of $1,561,364 to these claims.

We find that Crane should have been given a credit of $1,039,290 against the jury's economic damages award. This figure is reached by first subtracting the amount of the prior settlements attributable to the wrongful death claims ($1,561,364) from the total of the prior settlements ($4,592,248), and then multiplying the result by the 34.29 percent of the jury's total verdict against Crane comprising economic damages. Although this method of calculating the settlement credit appears on the surface to be different from that utilized in *Wilson, supra,* 81 Cal.App.4th at page 864, footnote 18, the two methods are in fact identical in mathematical substance and produce the same result when correctly applied.[13]

In sum, when the jury awards economic damages to the injured plaintiff as well as loss of consortium damages to the spouse, and there are preverdict settlements embracing such damages, the principles established in *Espinoza, supra,* 9 Cal.App.4th 268 and *Greathouse, supra,* 35 Cal.App.4th 831 require the trial court to apply the ratios established by the jury's verdict to

---

[13]Thus, in this case, 25.27 percent ($1.25 million ÷ $4,946,132) of the jury's total damage award against Crane was for Hackett's loss of consortium. If this ratio is multiplied by the nonwrongful death portion of the settlement ($3,030,884), the resulting product ($765,904) is the amount of the settlement that is properly allocable to loss of consortium, i.e., an allocation based on the jury's verdict rather than the court's discretion. When this allocation is used in the *Wilson* formula, the settlement credit so calculated is the same as that computed under plaintiffs' approach, except for slight differences caused by rounding off the ratios used. Both methods eliminate noneconomic damages in computing the nonsettling defendant's credit, but each takes a slightly different arithmetic route to that destination.

apportion the settlement amounts between economic and noneconomic damages.[14] This can be accomplished most directly by multiplying the jury's ratio of economic to total damages (including loss of consortium) by the portion of the total settlement allocable to damage claims actually adjudicated by the jury's verdict. Alternatively, the court can apply the approach used in *Wilson, supra,* 81 Cal.App.4th at page 864, footnote 18 of subtracting loss of consortium from both the jury's verdict and the prior settlements. However, the amount of the settlement attributed to loss of consortium for purposes of applying *Wilson* must be based on the *jury's* relative valuation of the loss of consortium claim rather than on the trial court's independent exercise of discretion. Under either approach, the trial court retains discretion in determining the portion of the settlements to allocate to noneconomic damages claims, such as the heirs' potential wrongful death claims in this case, that are covered by preverdict settlements but not adjudicated by the jury.

Accordingly, we will modify the judgment to reduce Crane's credit for economic damages by $33,367. Lewis's net verdict for economic damages will increase to $656,842, and the total damages awarded to him by the judgment will be adjusted to $1,026,842.

### E. *Expert Witness Fees\**

. . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. Disposition

The judgment in favor of Lewis is increased to $1,026,842. Except as so modified, the judgment appealed from is affirmed. The trial court's October 27, 2000 order awarding expert witness fees is affirmed. Respondent and appellant Shirley Hackett shall recover her costs on appeal.

Stein, Acting P. J., and Swager, J., concurred.

A petition for a rehearing was denied June 26, 2002, and the opinion was modified to read as printed above. The petition of appellant John Crane, Inc., for review by the Supreme Court was denied September 25, 2002.

---

[14]Credits for postverdict settlements are governed by different principles. (See *Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 37-42 [56 Cal.Rptr.2d 455].)

\*See footnote, *ante,* page 1233.