[No. A105673. First Dist., Div. Three. Aug. 24, 2005.]

ELLEREE JONES, Plaintiff and Respondent, v.
JOHN CRANE, INC., Defendant and Appellant.

[No. A106160. First Dist., Div. Three. Aug. 24, 2005.]

ELLEREE JONES, Plaintiff and Appellant, v.
JOHN CRANE, INC., Defendant and Respondent.

COUNSEL

Hassard Bonnington, Philip S. Ward, Robert L. Nelder and Richard G. Katerndahl for Defendant and Appellant and for Defendant and Respondent.

Brayton-Purcell, Alan R. Brayton, Gilbert L. Purcell and Lloyd F. DeRoy for Plaintiff and Respondent and for Plaintiff and Appellant.

OPINION

**POLLAK, J.**—Defendant John Crane, Inc. (Crane) appeals from a judgment entered in favor of plaintiffs Edward and Elleree Jones on their complaint for personal injury and loss of consortium.[1] Crane contends there is no substantial evidence to support the jury's finding that the exposure of Edward Jones (Jones) to its asbestos-containing products was a substantial factor contributing to his development of lung cancer. Defendant also disputes the applicability of the consumer expectations test to plaintiffs' product liability causes of action. In a consolidated appeal, plaintiffs challenge the trial court's refusal, in determining the net amount of the judgment against Crane, to allocate amounts recovered in pretrial settlements pursuant to the terms of the settlement agreements. Plaintiffs also appeal the denial of their request for prejudgment interest and expert witness costs. We shall affirm the judgment in all respects.

### Factual and Procedural History

Jones began his career in the Navy as a fireman's apprentice in 1950 and ultimately retired in 1977 as a lieutenant commander. He married Elleree Jones in 1981. Throughout the course of his 27-year naval career he was regularly exposed to asbestos products, including valve and pump packing materials manufactured by Crane.

Jones was diagnosed with lung cancer in December 2001. Plaintiffs' complaint against 46 defendants for personal injury and loss of consortium alleges that defendants were negligent, that their asbestos-containing products were defective in design in that they failed to meet the ordinary consumer's expectation of safety, that defendants failed to provide adequate warnings for their products and that defendants' products were a substantial factor in causing Jones's illness.

---

[1] Plaintiff Edward Jones died while the present appeal was pending. Elleree Jones's motion to substitute herself as the successor in interest for Edward Jones is granted. We refer to Elleree Jones in both her representative and individual capacity as plaintiffs.

Prior to trial, plaintiffs settled with all but two of the named defendants for sums totaling $1,512,582. The settlement agreements purported to release the settling defendants from all claims arising from Jones's exposure to asbestos and allocated the settlement proceeds between Jones's personal injury claim, his wife's loss of consortium claim and any future wrongful death claims made by Jones's heirs. Defendant rejected plaintiffs' offer pursuant to Code of Civil Procedure[2] section 998 to settle Jones's claim for $19,999 and his wife's claim for $9,999.

The jury returned a special verdict in favor of plaintiffs. The jury found that Crane's products contained a design defect, that Crane failed to give an adequate warning and was negligent, and that its products caused Jones to suffer injury. The jury also found in favor of Mrs. Jones on her loss of consortium claim. The jury found Jones's economic damages to be $1,048,000 and his noneconomic damages to be $3.5 million, and Mrs. Jones's damages to be $500,000. The jury apportioned 1.95 percent of the fault for plaintiffs' injuries to Crane. Judgment was entered and Crane thereafter filed a timely notice of appeal (No. A105673).

Plaintiffs subsequently served a notice of entry of judgment and, on the same day, filed a memorandum of costs. A month later they filed two additional motions. The first sought to allocate the proceeds of pretrial settlements pursuant to Civil Code section 1431.2. The other sought to recover expert witness costs under section 998 and prejudgment interest under Civil Code section 3291. The trial court denied as untimely plaintiffs' request for expert witness fees and prejudgment interest, and issued an order allocating the proceeds of the pretrial settlements. Plaintiffs filed a timely notice of appeal from the court's posttrial orders (No. A106160). Plaintiffs' appeal has been consolidated with defendant's appeal for all purposes.

### Discussion

I. *CRANE'S APPEAL (No. A105673)*

A. *Substantial evidence supports the verdict finding that Crane's products were a substantial factor in causing Jones's cancer.*

Crane contends there is no substantial evidence to support the jury's finding that its valve and pump packing was a legal cause of harm to Jones. *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953 [67 Cal.Rptr.2d 16, 941 P.2d 1203] (*Rutherford*) sets forth the controlling standard for proving causation in an asbestos-induced personal injury case. "[T]he plaintiff must

---

[2] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

first establish some threshold exposure to the defendant's defective asbestos-containing products, and must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury." (*Id.* at p. 982, fn. omitted.) "In an asbestos-related cancer case, the plaintiff need *not* prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth. Instead, the plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of developing cancer." (*Id.* at pp. 982–983.) Put another way, the critical question is whether a "plaintiff's exposure to [a] defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer." (*Id.* at pp. 976–977, fn. omitted.)[3]

Defendant does not dispute that Jones satisfied the requisite threshold showing of exposure to its asbestos containing products, but contends that the jury's finding that this exposure was a substantial factor contributing to Jones's cancer is not supported by substantial evidence. Crane argues that the fiber releases from its product were comparable to ambient levels of asbestos in the community at large and cannot be found to have increased Jones's risk of cancer.

██ "Ultimately, the sufficiency of the evidence of causation will depend on the factual circumstances of each case. Although the plaintiff must, in

---

[3] Contrary to defendant's assertion, the California Supreme Court's decision in *Viner v. Sweet* (2003) 30 Cal.4th 1232 [135 Cal.Rptr.2d 629, 70 P.3d 1046] (*Viner*) did not alter the causation requirement in asbestos-related cases. In *Viner*, the court noted that subsection (1) of section 432 of the Restatement Second of Torts, which provides that "the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent," "demonstrates how the 'substantial factor' test subsumes the traditional 'but for' test of causation." (*Viner, supra,* at p. 1240.) Defendant argues that *Viner* required plaintiffs to show that defendant's product "independently caused Mr. Jones's injury or that, but for that exposure, Mr. Jones would not have contracted lung cancer."*Viner,* however, is a legal malpractice case. It does not address the explicit holding in *Rutherford* that "plaintiffs may prove causation in asbestos-related cancer cases by demonstrating that the plaintiff's exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate dose of asbestos the plaintiff or decedent inhaled or ingested, and hence to the risk of developing asbestos-related cancer, without the need to demonstrate that fibers from the defendant's particular product were the ones, or among the ones, that actually produced the malignant growth." (*Rutherford, supra,* 16 Cal.4th at pp. 976–977, fn. omitted.) *Viner* is consistent with *Rutherford* insofar as Rutherford requires proof that an individual asbestos-containing product is a substantial factor contributing to the plaintiff's risk or probability of developing cancer. (*Id.* at p. 977.)

accordance with traditional tort principles, demonstrate to a reasonable medical probability that a product or products supplied by the defendant, to which he became exposed, were a substantial factor in causing his disease or risk of injuries, he is free to further establish that his particular asbestos disease is cumulative in nature, with many separate exposures each having constituted a 'substantial factor' [citation] that contributed to his risk of injury." (*Rutherford, supra,* 16 Cal.4th at p. 958.) "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." (*Id.* at p. 978.)

■ Factors to consider in determining whether inhalation of fibers from the particular product should be deemed a "substantial factor" in causing the cancer include "the length, frequency, proximity and intensity of exposure, the peculiar properties of the individual product, any other potential causes to which the disease could be attributed (e.g., other asbestos products, cigarette smoking), and perhaps other factors affecting the assessment of comparative risk." (*Id.* at p. 975.) In Rutherford, the court recognized that "a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor," but warned that "[u]ndue emphasis should not be placed on the term 'substantial.' For example, the substantial factor standard, formulated to aid plaintiffs as a broader rule of causality than the 'but for' test, has been invoked by defendants whose conduct is clearly a 'but for' cause of plaintiff's injury but is nevertheless urged as an insubstantial contribution to the injury. [Citation.] Misused in this way, the substantial factor test 'undermines the principles of comparative negligence, under which a party is responsible for his or her share of negligence and the harm caused thereby.' " (*Id.* at p. 969.)

■ Here, the record amply supports the jury's finding that Jones's exposure to Crane's products was a substantial factor contributing to the risk of his developing lung cancer. Dr. Samuel Hammar, an expert pathologist, examined the concentration levels of asbestos in Jones's lung tissue and concluded that his lung cancer had been caused by asbestos exposure. Dr. Barry Horn testified that Jones had substantial occupational exposure to asbestos while in the Navy and that every exposure, including asbestos releases from defendant's packing and gasket products, contributed to the risk of developing lung cancer. The testimony of the experts provided substantial evidence that Jones's lung cancer was caused by cumulative exposure, with each of many separate exposures having constituted substantial factors contributing to his risk of injury. (See also *Rutherford, supra,* 16 Cal.4th at p. 958.)

Defendant argues that the fibers released from its products were no greater than the ambient level of asbestos in the atmosphere. Its industrial hygienist testified that the general range of fibers released from installation and removal of Crane's products is 0.01 to 0.1 fibers per cubic centimeter of air,

and its experts calculated Jones's total asbestos exposure from Crane's products at 10 fiber hours, or .005 fiber years. Defendant's experts considered this amount trivial when compared to the more than 200 fiber years of asbestos exposure Jones suffered during the seven to 12 years he worked with thermal insulation and his estimated 2.8 fiber years of asbestos exposure from nonoccupational ambient asbestos over the course of his lifetime. Plaintiffs, however, presented substantial evidence challenging these calculations. Philip Templin, plaintiffs' expert industrial hygienist, questioned the reliability of the studies of fiber releases from gasket and packing materials on which defendant's experts relied, because they were single point release studies and not performed in an engine room with other machinists doing the same type of work. He explained that actual working conditions, including lack of ventilation, cramped quarters, proximity of others creating asbestos dust, and cleanup procedures increase exposure levels and must be taken into account in evaluating the exposure. Templin cited to studies showing far higher exposure ranges for packing materials.

Plaintiffs also challenged defendant's assertion that Jones's total exposure to asbestos from its products was significantly less than a lifetime of exposure to ambient asbestos. Based on defendant's calculations, the fibers released from defendant's valve packing, 0.01 to 0.1 fibers per cubic centimeter, are tenfold the level of asbestos found in ambient air, i.e., from .001 to .01 fibers per cubic centimeter. Defendant attempts to minimize this disparity by comparing a potential lifetime of ambient exposure to Jones's aggregate occupational exposure to asbestos from its products. But a level of exposure that is the equivalent of that to which one might be exposed in the ambient air over a lifetime is not necessarily insignificant. *Rutherford* does not require that each exposure be sufficient to independently cause lung cancer. To the contrary, the exposure need only be "a substantial factor in contributing to the aggregate *dose* of asbestos the plaintiff . . . inhaled." (*Rutherford, supra,* 16 Cal.4th at p. 976.) The mere fact that comparable levels could be found in ambient air does not render the exposure "negligible or theoretical." (*Id.* at p. 978.) As Dr. Hammar recognized, if a person were exposed to six different products, each with a release level similar to the asbestos levels recorded in ambient air, the combined concentration in the total dose would contribute substantially to the increased risk of cancer. We heed the admonition in *Rutherford* to be wary of the misapplication of the substantial factor test.[4]

---

[4] *Lindstrom v. AC Products Liability Trust* (N.D. Ohio 2003) 264 F.Supp.2d 583, 588, relied on by defendant, is not to the contrary. In *Lindstrom,* the court held that a declaration from the plaintiff's expert that opined "that there is no safe level of asbestos exposure, and that every exposure to asbestos, however slight, was a substantial factor in causing [the plaintiff's] disease," was insufficient to overcome the defendant's motion for summary judgment. (*Ibid.*) The court reasoned that "If an opinion such as [that] would be sufficient for plaintiff to meet his burden, the . . . 'substantial factor' test would be meaningless." (*Ibid.*) The *Lindstrom* opinion,

B. *The consumer expectations test was applicable to plaintiffs' product liability claims.*

The jury found in plaintiffs' favor on multiple theories of liability, any one of which provides a sufficient basis on which to uphold the judgment. Crane makes no challenge to the sufficiency of the evidence or the correctness of the instructions on the negligence cause of action (other than with respect to the issue of causation, discussed *ante*). Nonetheless, we shall consider Crane's arguments regarding plaintiffs' additional theories of liability.

■ Plaintiffs prosecuted their product liability claim solely as a design defect under the consumer expectations theory. "The consumer expectations test asks if the reasonable minimum safety expectations of the product's ordinary consumers were violated." (*Arena v. Owens-Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1185 [74 Cal.Rptr.2d 580].) The jury was instructed that a "product is defective in design if it fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner." (BAJI No. 9.00.5.)

Defendant contends that the consumer expectations test is inapplicable where "the issues of alleged product defect and its causal relationship to plaintiffs' claimed injuries, could only be resolved by the testimony of experts called by both sides from a variety of fields." Defendant suggests that nothing in the "everyday experience of users of valve and pump packing would permit them to form any assumptions concerning the health risks attendant to the use of such a product."

■ In *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 567 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*), the Supreme Court held that the consumer expectations test is properly applied in "cases in which the *everyday experience* of the product's users permits a conclusion that the product's design violated *minimum* safety assumptions, and is thus defective *regardless of expert opinion about the merits of the design*." In contrast, the test should not be used "when the ultimate issue of design defect calls for a careful assessment of feasibility, practicality, risk, and benefit," since " 'in many instances it is simply impossible to eliminate the balancing or weighing of competing considerations in determining whether a product is defectively designed or not.' " (*Id.* at pp. 562–563.) "The crucial question in each individual case is whether the circumstances of the product's failure permit

---

however, does not specify what facts the plaintiff presented regarding his actual exposure to any given product. Here, plaintiffs presented detailed evidence at trial of the length and extent of Jones's exposure to defendant's product and based on this evidence the jury concluded that Jones's exposure to defendant's product was a substantial factor in causing his illness.

an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." (*Id.* at pp. 568–569.)

In *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 465, 469 [38 Cal.Rptr.2d 739] (*Sparks*), the court held that the consumer expectations test is applicable in the context of asbestos litigation. The court reasoned that "[t]here were neither 'complicated design considerations,' nor 'obscure components,' nor 'esoteric circumstances' surrounding the 'accident' in the instant case. [The defendant's product] was a common type of asbestos-containing block insulation. It was a simple, stationary product in its ordinary uses. Because it was made of friable material that had to be cut and shaped to perform its insulating function on irregularly shaped objects, it generated large amounts of asbestos-laden dust during normal installation, inspection, removal, and replacement processes. The design failure was in [the product's] emission of highly toxic, respirable fibers in the normal course of its intended use and maintenance as a high-temperature thermal insulation. It is a reasonable inference from the evidence that this emission of respirable fibers, which were capable of causing a fatal lung disease after a long latency period, was a product failure beyond the 'legitimate, commonly accepted minimum safety assumptions of its ordinary consumers.' " (*Id.* at pp. 474–475; see also *Morton v. Owens-Corning Fiberglas Corp.* (1995) 33 Cal.App.4th 1529, 1535 [40 Cal.Rptr.2d 22] [consumer expectations test applicable in case involving raw asbestos]; *Arena v. Owens-Corning Fiberglas Corp., supra,* 63 Cal.App.4th at pp. 1183–1190 [same].)

Defendant contends that *Sparks* is distinguishable because, unlike the relatively simple design of the insulation at issue in *Sparks,* "a host of experts—and many hours of testimony, explications of studies and demonstrative aids—were required to explain the complex nature and behavior of John Crane's products, particularly measurements of the amounts of asbestos released during ordinary handling (i.e., in the course of occasional replacement, since packing typically is enclosed in pumps or valves while in use), as well as disputed testimony about the degree to which asbestos fibers were embedded or encapsulated in that product." We disagree.

During his opening statement to the jury, defendant's counsel explained that Crane manufactures valve packing, which stops the flow of liquid or steam through a valve stem and gaskets, which seal two pieces of pipe together to prevent liquid or steam from leaking out of the pipe. He also demonstrated how in the ordinary course of repairing a leaky valve a worker might be required to replace the packing. While the experts disputed the quantity of asbestos dust released when the packing was being replaced, it was undisputed that some asbestos fibers were released during the replacement of the packing. According to defendant's own explanation, there is

nothing complicated or obscure about the design and operation of the products, nor are there any esoteric circumstances surrounding the manner in which Jones was exposed to the asbestos fibers. As in *Sparks*, "[t]he design failure was in [the products'] emission of highly toxic, respirable fibers in the normal course of [their] intended use and maintenance." (*Sparks, supra*, 32 Cal.App.4th at p. 475.)

Jones testified that every time a valve was pulled, the packing was changed, and that with many machinists working in the same room, the air became dusty and dirty. When he and other machinists cleaned the work area each day, they swept debris that included valve packing and gaskets. The debris was not wetted down before being swept, and the workers did not wear any respiratory protection. The jury reasonably could find that those working with defendant's products did not expect to develop lung cancer from simply breathing the dust created in the ordinary use of the product. The jury therefore could reasonably infer that defendant's products did not meet the " 'minimum safety assumptions of its ordinary consumers.' " (*Sparks, supra*, 32 Cal.App.4th at p. 474.)

 The fact that expert testimony was required to establish legal causation for plaintiffs' injuries does not mean that an ordinary user of the product would be unable to form assumptions about the safety of the products. The consumer expectations test does not require inquiry into how exposure to a particular level of asbestos may lead to the development of cancer. To the contrary, the test asks the jury to decide "whether the circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." (*Soule, supra*, 8 Cal.4th at pp. 568–569.) In *Soule*, the court expressly rejected the contention that the consumer expectations test is improper whenever "technical questions of causation are at issue," stating that "ordinary consumer expectations are not irrelevant simply because expert testimony is required to prove . . . that a condition of the product as marketed was a 'substantial,' and therefore 'legal,' cause of injury." (*Id.* at pp. 568–569 & fn. 6.)

Defendant's reliance on *Morson v. Superior Court* (2001) 90 Cal.App.4th 775 [109 Cal.Rptr.2d 343], is misplaced. In *Morson* the court considered whether application of the consumer expectations test was appropriate to a claim that latex gloves were defectively designed "because the usage of latex gloves . . . allegedly had the effect of increasing [the plaintiffs'] sensitization to the natural substance of latex in their individual biological systems." (*Id.* at p. 779.) After pointing out that the circumstances of the product's failure in that case "involve[d] technical and mechanical details about the operation of the manufacturing process, and then the effect of the product upon an

individual plaintiff's health" (*id.* at p. 792), the court held that "[t]he alleged creation or exacerbation of allergies by a product, such as by the presence of certain levels of proteins on the surface of latex gloves, to which the user is exposed, are not subjects of commonly accepted minimum safety assumptions of an ordinary consumer" (*id.* at p. 795). In contrast, the alleged design defect in Crane's valve packing and gaskets arises from the release of toxic respirable fibers during the routine and relatively straightforward use of the products. *Morson* explicitly refused to draw an analogy between latex glove and asbestos cases, explaining that "We find such [asbestos-related] authorities to be of limited value here due to the problem of comparing apples and oranges in such fact-specific circumstances." (*Id.* at p. 786.)

C. *Substantial evidence supports the jury's finding that there was a scientifically known or knowable medical probability that its products would increase the risk of cancer at the time of Jones's exposure.*

With respect to plaintiffs' cause of action based on Crane's failure to warn, the jury was instructed that a "manufacturer has a duty to provide an adequate warning to the consumer of a product of potential risks or side effects which may follow the foreseeable use of the product, and which are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution." (BAJI No. 9.00.7; see *Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1004 [281 Cal.Rptr. 528, 810 P.2d 549].) Defendant contends that the jury's finding that it had such knowledge is not supported by the record because it did not have actual knowledge of any danger associated with its product until after Jones had retired, nor did it have any basis to suspect such danger.

Based on a review of the historical literature, Dr. Cohen testified that by 1930 it was well established in the medical and scientific communities that asbestos causes asbestosis. By 1951 or 1952, nonmedical texts such as the Encyclopedia Britannica noted that asbestos probably causes lung cancer, and a 1955 medical article noted that the majority of investigators accepted the fact that asbestos causes lung cancer. Dr. Cohen testified that beginning in 1946 the American Conference of Governmental Industrial Hygienists published standards for airborne asbestos dust exposure. Similar standards were adopted by the federal government in 1971. This evidence amply supports the jury's finding that the risks associated with Crane's products, if not actually known by defendant at the time of Jones's exposure, reasonably could have been ascertained.

There was ample evidence to support the jury's rejection of defendant's claim that it had no reason to suspect there was any danger associated with its

product. Although no formal studies were performed on the risks associated with packing and gaskets until after 1980, Dr. Cohen testified that articles published as early as 1950 connected packing and gaskets to the potential risk of asbestos-related disease. Crane's diligence in investigating the safety of its products was called into question by the evidence that it did not study the safety of its products for a significant time after purportedly learning of the dangers of asbestos, and did not begin warning its customers of the dangers associated with its products until 1983.

Defendant's reliance on statements contained in a report prepared by Dr. Cohen in 1980 is misplaced. In this report, Cohen addressed whether there is a safe level of exposure for lung cancer, and more specifically the likelihood of contracting lung cancer from exposure to the gasket and packing products of another manufacturer. He stated, "Although I believe a threshold for asbestos-related pulmonary carcinoma exists, data has not been produced to determine where that level lies. Existing data is based upon the asbestos exposure levels indicated in the previous section, which range from approximately 100 to 10,000 times that encountered with exposure to Garlock's products." Ultimately, the report concludes that "the risk of lung cancer . . . appears very low." In the final section of the report, Cohen addressed whether the manufacturer should have suspected a hazard due to the asbestos exposure involved in using its product. He concluded, "Because the Cal OSHA is at 2.0, because most other industrialized nations have a recommended asbestos exposure standard between 5 and .1 fibers per cc, because there is no good data showing toxic effects at levels lower than 2.0 fibers per cc and because Garlock product user exposures are and previously have been well below that, I do not feel that Garlock should have ever suspected a hazard." Cohen confirmed at trial that he still believes there is a threshold level of exposure below which there is no increased risk of developing lung cancer. He agreed that by definition ambient levels of asbestos would be the lowest possible threshold because "background [asbestos] is where the risk would be the same for everybody." Cohen's report, however, was predicated on an assumed release level of only .006 to .05 fibers per cubic centimeter in isolation, without consideration of other exposures. The evidence of estimated fiber releases from defendant's products ranged from .01 to several fibers per cubic centimeter for packing materials and more for gaskets. The evidence also demonstrates that defendant was exposed on a continual basis to fibers released by many products in the cramped quarters of an engine room. With fiber releases at this level, there is no inconsistency between the conclusions reached in Cohen's earlier report and his trial testimony.

## II. *PLAINTIFFS' APPEAL (No. A106160)*

### A. *The trial court did not abuse its discretion in allocating the proceeds of the pretrial settlements.*

█ Under Civil Code section 1431.2, defendant's liability for noneconomic damages is several only, and it is liable only for the portion of plaintiffs' noneconomic damages that corresponds to its percentage of fault. The jury found Crane to be responsible only for 1.95 percent of plaintiffs' injuries. Defendant is jointly liable for plaintiffs' economic damages, and thus is entitled under section 877 to a credit for amounts previously recovered from other parties for these damages.[5] Plaintiffs challenge the trial court's calculation of defendant's credit under section 877.

█ The well accepted framework for calculating settlement credits is found in *Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 276–277 [11 Cal.Rptr.2d 498], and *Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831, 840–841 [41 Cal.Rptr.2d 561]. When prior recoveries have not previously been allocated in a manner found by the court to be in good faith, the posttrial allocation of prior settlements should mirror the jury's apportionment of economic and noneconomic damages. More recently, in *Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847 [97 Cal.Rptr.2d 240] (*Wilson*) and *Hackett v. John Crane, Inc.* (2002) 98 Cal.App.4th 1233 [120 Cal.Rptr.2d 662] (*Hackett*), the courts have further refined these rules. In *Wilson*, the jury rendered a verdict against Crane for damages based on the husband's asbestos-related personal injury and the wife's loss of consortium. Prior to trial, plaintiffs reached settlements with other defendants that purported to encompass the husband's personal injury claims, the wife's loss of consortium claim, and the potential future wrongful death claims of the heirs. The settlement agreements allocated the settlements pursuant to the same 60/20/20 ratio used in the present case. (*Wilson, supra,* at p. 864.) Citing *Wilson,* the *Hackett* court held that the settlement credit should be calculated as follows: "First, excluding the wife's loss of consortium damages, determine the ratio of economic to total damages as awarded by the jury. Second, subtract from the amount of the pretrial settlement the portions of the settlement properly found to be allocable to the wife's loss of consortium claim and the heirs' potential wrongful death claims. Third, multiply the two figures together to

---

[5] Section 877 provides in relevant part, "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater."

determine the amount of the defendant's settlement credit for economic damages." (*Hackett, supra,* 98 Cal.App.4th at p. 1240, citing *Wilson, supra,* 81 Cal.App.4th at p. 864, fn. 18.)

In *Hackett,* the court applied the formula somewhat differently, but recognized that the result would be identical. (*Hackett, supra,* 98 Cal.App.4th at p. 1244, fn. 13.) However, *Hackett* addresses a question left unanswered in *Wilson* that is of particular importance in this case. The court held that in calculating the percentage of the settlement proceeds attributable to personal injury and loss of consortium claims, the trial court must rely on the proportion reflected in the jury verdict if the claims were submitted to the jury and the trial court had not previously approved the good faith of the settlement. (*Hackett, supra,* at pp. 1243–1244.) The court reasoned, "Loss of consortium is simply a label for one type of noneconomic damages. As long as claims for such damages were encompassed by the prior settlements and the amount of the damages were determined by the fact finder, they are logically indistinguishable from any other noneconomic damages." (*Ibid.*)

Here, the trial court disregarded the allocation of settlement proceeds that was specified in the settlement agreements but never judicially approved, and calculated a $313,452 credit against the economic damages in the following manner. First, the court determined that economic damages constituted 23 percent of Jones's total damages by dividing the economic damages awarded to Jones ($1,048,000) by the total damages awarded to Jones ($4,548,000).[6] Then the court multiplied the total amount of the pretrial settlements ($1,512,582) by 23 percent, effectively removing Jones's noneconomic damages from the settlement proceeds. The resulting figure is $347,894. Next, the court determined that 90.1 percent of the damages awarded by the jury were for personal injury and that 9.9 percent were for loss of consortium by dividing the damages awarded for loss of consortium ($500,000) by the total damages awarded ($5,048,000). Finally, the trial court multiplied the remaining settlement proceeds ($347,894) by 90.1 percent to exclude the portion attributable to Mrs. Jones's loss of consortium claim, resulting in a total credit of $313,452.[7] Despite the provision in the settlement agreements

---

[6] The jury calculated Jones's damages as follows: $187,500 for past medical expenses, $122,500 for future medical expenses, $748,000 in additional nonmedical economic damages, and $3,500,000 in noneconomic damages. The jury awarded Mrs. Jones $500,000 in damages for loss of consortium.

[7] The trial court's formula is similar to that applied in *Wilson,* except that the court reversed the order of the second and third steps, which has no effect on the outcome. The same result, except for slight differences caused by rounding, is produced by use of the *Hackett* formula, under which the ratio of economic to noneconomic damages in the jury's total award, including the damages awarded for loss of consortium (1,048,000/5,048,000 or 20.7 percent) is multiplied by the total settlement amount, for a credit of $313,104. In both *Wilson* and *Hackett,* however, the courts allocated a portion of the settlements to wrongful death claims and those

allocating 20 percent of the settlement proceeds to the release of future wrongful death claims, the trial court did not allocate any portion of the prior settlements to potential wrongful death claims.

Plaintiffs contend that the court erred in calculating defendant's section 877 credit by rejecting the allocation agreed to by the settling parties, i.e., 60 percent for personal injury, 20 percent for loss of consortium, and 20 percent for potential wrongful death claims. We disagree.

The court rejected the allocation of 20 percent to Mrs. Jones's loss of consortium claim on the ground that the allocation differed from the percentage of the jury's verdict allocated to the same claim. The court believed that allocating the settlement in the manner suggested by plaintiffs would "subvert the finding of the trier of fact, the jury, without appropriate basis." The court continued, "This Court finds it significant that no party has challenged the reasonableness of the allocation made by the trier of fact in this case. The jury has established a breakdown after presumably reviewing fairly the evidence presented regarding the injury and causation evidence to plaintiffs. The determination by counsel for the plaintiffs on the breakdown of the settlements is different from the fact determination by the jury. Based on this record, there is insufficient basis for electing to recognize the plaintiff's counsel's determination over that of the jury." Absent a prior judicial determination of the good faith of allocations made in the settlement agreements, the trial court properly utilized the jury's verdict to allocate damage components as to which the jury made findings. As required by *Hackett, supra,* 98 Cal.App.4th at pages 1243–1244, the court properly allocated 9.9 percent of the settlement proceeds to the loss of consortium claim.

Nor did the trial court abuse its discretion in refusing to allocate any portion of the prior settlements to a potential wrongful death action. Unlike the loss of consortium claim, the jury of course made no findings with respect to the value of a potential wrongful death claim. Trial courts generally have wide discretion in allocating prior settlement recoveries to claims not adjudicated at trial. (*Hackett, supra,* 98 Cal.App.4th at p. 1242.) Here, the trial court rejected the agreed-upon allocation, stating "The Court will not speculate on the issue regarding what is appropriate [to allocate to a potential wrongful death claim] because the record before this Court provides no basis for such a decision. The Court recalls no evidence on the matter of the family of Edward Jones at this time. Any breakdown from wrongful death will have to be resolved by another tribunal with sufficient evidence for such a decision." Plaintiffs contend that the trial court's insistence that they present

amounts were subtracted from the total settlement recoveries before the recoveries were allocated between economic and noneconomic damages.

evidence in support of the allocation made in the settlement agreements improperly shifted to them the burden of proof on Crane's entitlement to a credit.

Plaintiffs do not dispute that Crane was entitled under section 877 to a credit in "the amount stipulated by [the settlement agreements], or in the amount of the consideration paid for [them] whichever is the greater." There is also no dispute as to the total value of the settlements. Accordingly, Crane's entitlement to a credit was established, and the burden shifted to plaintiffs to show that Crane was not entitled to a credit in the full amount of the settlements because some portion of the recovery should be allocated to other claims.

Because the settlement agreements had not previously been judicially approved, the trial court was not bound by the allocations made in the agreements. (*Wilson, supra,* 81 Cal.App.4th at p. 866.) Instead, the court's task was to determine whether there was a reasonable basis on which to justify those allocations. (*Ibid.*) To enable the court to perform that responsibility, plaintiffs had the burden to present evidence from which the trial court could determine the reasonableness of the proposed allocation.

Contrary to plaintiffs' assertion, this requirement does not place an improper burden of proof upon them. Section 877.6, subdivision (d) places the burden of proving a lack of good faith on a party challenging the good faith of a settlement agreement when a settling party seeks approval of the agreement before trial. However, that section does not relieve the settling party from the burden of demonstrating the reasonableness of any allocation of the proceeds when the agreement has not previously been approved by the court. The plaintiff is in a far better position than nonsettling defendants to present the relevant information. And, unlike the situation with respect to the gross amount of the settlements, there is no adversity of interests in making an allocation that is not presented to the court for its approval under section 877.6.

"[W]here an allocation is made of settlement proceeds which will affect the ultimate setoff or credit that a nonsettling defendant will receive against any future judgment, the allocation may not be given presumptive effect unless it was the product of adverse negotiation." (*Regan Roofing Co. v. Superior Court* (1994) 21 Cal.App.4th 1685, 1702–1703 [27 Cal.Rptr.2d 62].) Ordinarily "settling defendants . . . are not in an adversarial position with plaintiffs as to the allocation of settlement proceeds to separate causes of action. While plaintiffs have an interest in allocating as large an amount as possible to causes of action, in which there are no nonsettling defendants, the settling defendants will be released of further claims against

them regardless of the allocation and thus have no interest in the allocation of the settlement proceeds beyond their interest in obtaining a good faith determination." (*L. C. Rudd & Son, Inc. v. Superior Court* (1997) 52 Cal.App.4th 742, 748 [60 Cal.Rptr.2d 703].) Accordingly, "[w]here the settling parties have agreed to allocate less than all of the settlement amount to a portion of the causes of action, an evidentiary showing is required to justify such allocation." (*Erreca's v. Superior Court* (1993) 19 Cal.App.4th 1475, 1491 [24 Cal.Rptr.2d 156].)[8]

 The party seeking to rely on the allocation "must explain to the court and to all other parties, by declaration or other written form, the evidentiary basis for any allocations and valuations made, and must demonstrate that the allocation was reached in a sufficiently adversarial manner to justify the presumption that a reasonable valuation was reached." (*Erreca's v. Superior Court, supra,* 19 Cal.App.4th at pp. 1495–1496.) The settling parties are not required "to make a complete explanation of their rationale for the allocation of settlement consideration or to set forth a factual matrix showing the allocation by trade or by defendant." (*Regan Roofing Co. v. Superior Court, supra,* 21 Cal.App.4th at p. 1704.) But the settling parties are required to "furnish to the court and to all parties an evidentiary showing of a rational basis for the allocations made and the credits proposed. They must also show that they reached these allocations and credit proposals in an atmosphere of appropriate adverseness so that the presumption may be applied that a reasonable valuation was reached." (*Ibid.*)

 Here, plaintiffs' only evidentiary showing was a declaration submitted by their attorney stating, "The Compromise and Release memorializing each settlement reflects allocations that are reasonable . . . and were arrived at by reference to my firm's experience prosecuting like claims up to and through verdict, as well as by reference to recent Court of Appeal (Division 1) decisions approving said allocations." Implicit in this statement is the acknowledgment that the allocation was not based on an individualized consideration of the potential claims of Jones's heirs. The determination of the value of potential wrongful death claims requires, at a minimum, some information regarding the number of heirs and the nature of their relationship

---

[8] *Wilson, supra,* 81 Cal.App.4th at page 866, relied upon by plaintiffs, is not to the contrary. In *Wilson,* the court noted that "[t]he burden was on defendant to establish its entitlement to a settlement credit" and held that defendant waived its right to challenge the court's allocation to the loss of consortium claim by failing properly to press the matter in the trial court. (*Id.* at p. 865 [defendant "never pressed the correct calculus upon the trial court and indeed, as we have previously noted, scarcely addressed the loss-of-consortium element at all"].) Thus, *Wilson* did not reach the issue in this case, whether plaintiffs provided a sufficient factual basis for their proposed allocation.

with the decedent.[9] (See *Hackett, supra*, 98 Cal.App.4th at p. 1241 [substantial evidence supports allocation of 34 percent of the settlements to potential wrongful death claims where evidence showed that decedent was a kind and attentive father and that he had a close relationship with his wife and two sons].) The trial court has broad discretion in evaluating the various components of a settlement. It cannot be faulted for insisting that there be at least some evidence on which to justify the estimated value of a potential wrongful death claim. (*Franklin Mint Co. v. Superior Court* (2005) 130 Cal.App.4th 1550 [31 Cal.Rptr.3d 319]; *Alcal Roofing & Insulation v. Superior Court* (1992) 8 Cal.App.4th 1121, 1129 [10 Cal.Rptr.2d 844].) The trial court's refusal to make an allocation for which there was no evidence of its reasonableness was not an abuse of discretion.

B. *The trial court did not err in denying plaintiffs' motion for expert witness fees and prejudgment interest.*

Plaintiffs moved to recover expert witness fees under section 998 and prejudgment interest under Civil Code section 3291. Section 998 provides in relevant part: "(b) Not less than 10 days prior to commencement of trial or arbitration (as provided in Section 1281 or 1295) of a dispute to be resolved by arbitration, any party may serve an offer in writing upon any other party to the action to allow judgment to be taken or an award to be entered in accordance with the terms and conditions stated at that time. [¶] . . . [¶] (d) If an offer made by a plaintiff is not accepted and the defendant fails to obtain a more favorable judgment or award in any action or proceeding other than an eminent domain action, the court or arbitrator, in its discretion, may require the defendant to pay a reasonable sum to cover costs of the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the plaintiff, in addition to plaintiff's costs." Civil Code section 3291 adds in relevant part, "If the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment."

---

[9] In their statement of the facts, plaintiffs state, "Mr. Jones and his wife live in Santa Cruz. Her son, who is 42 years old, lives with them because he is developmentally challenged and they support him." Plaintiffs do not suggest that any evidence to this effect was brought to the attention of the trial court in support of their requested allocation, nor on appeal do they rely on these facts in urging the reasonableness of the allocation.

The trial court denied plaintiffs' request for expert witness fees under section 998 on the ground that the request was untimely. The trial court recognized that "[t]he award of expert witness expenses as a 'penalty' for failure to accept a pretrial 998 offer is discretionary, not automatic" (§ 998, subd. (d)) and rejected the request because it was untimely. Section 998, subdivision (a) expressly provides that "[t]he costs allowed under Sections 1031 and 1032 shall be withheld or augmented as provided in this section." Section 1032 provides for an award of costs to the prevailing party to be claimed pursuant to section 1034 and California Rules of Court, rule 870. Rule 870(a), as applicable in this case, required plaintiffs to file a memorandum of costs within 15 days after the date of mailing of the notice of entry of judgment. Notice of entry of judgment was served on November 13, 2003. The deadline for filing the memorandum thus was November 28, 2003, and plaintiffs' motion was not filed until December 15, 2003. While the court had discretion to excuse the untimeliness, it did not abuse its discretion in failing to do so in light of plaintiffs' failure to offer an "explanation . . . for this neglect." (See *Russell v. Trans Pacific Group* (1993) 19 Cal.App.4th 1717, 1725–1726 [24 Cal.Rptr.2d 274] [procedures for claiming costs are mandatory, although not jurisdictional, so that court may relieve party under section 473 for filing untimely cost bill].) Accordingly, the trial court did not err in denying plaintiffs' request for expert witness fees.

■ The basis of the trial court ruling with respect to prejudgment interest is somewhat unclear. The court order states, "prejudgment interest is not an element of costs but an element of damages. Hence a cost bill is not the appropriate vehicle for requesting prejudgment interest under Civil Code section 3281." Because the court could not recall whether plaintiff had properly requested prejudgment interest as an element of damages, however, it directed the plaintiffs to identify such a request on the record. Plaintiffs contend that the trial court misapplied the law by improperly treating their request as an element of damages under Civil Code section 3281, rather than a request for costs under Civil Code section 3291. While prejudgment interest under Civil Code section 3287 is an element of damages that must be claimed prior to entry of judgment (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 830 [76 Cal.Rptr.2d 743]), prejudgment interest under section 3291 is not an element of damages and must be claimed by memorandum of costs under section 1034 (see *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 532–533 [117 Cal.Rptr.2d 220, 41 P.3d 46]; *Mendez v. Kurten* (1985) 170 Cal.App.3d 481, 484 [215 Cal.Rptr. 924]). Defendant recognizes the trial court error in this regard, but argues nonetheless that the request was untimely and that the trial court ruling may be upheld on that basis. We agree. Plaintiffs' request for prejudgment interest accompanied their request for expert witness fees under section 998, which the court denied as

untimely. There is no basis to conclude that the court intended to treat either of plaintiffs' requests differently.

## Disposition

The judgment is affirmed. The parties shall bear their respective costs on appeal.

McGuiness, P. J., and Corrigan, J., concurred.

On September 21, 2005, the opinion was modified to read as printed above. The petition of appellant John Crane, Inc., for review by the Supreme Court was denied November 30, 2005.