Filed 10/30/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LANNETTE LOUISE LOPEZ et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> THE HILLSHIRE BRANDS COMPANY, <br><br>     Defendant and Appellant. | A152887 <br><br> (Alameda County <br> Super. Ct. No. RG14721622) |

Mark Lopez was diagnosed with epithelioid mesothelioma with a deciduoid pattern at the age of 59. He died from his disease at the age of 61. The physician who diagnosed him believed his mesothelioma was caused by exposure to asbestos.

In this survivor action, Lopez's widow Lannette Louise Lopez and his children Pilar Elan Nabb and Seth Vincent Lopez, who were 20 years old and 15 years old, respectively, at the time of diagnosis, sued The Hillshire Brands Company (Hillshire) and others.[1] The case proceeded to jury trial against Hillshire alone, on the theory that Lopez had been exposed to asbestos as a child in three ways when his father worked at a sugar refinery owned by Hillshire's predecessor-in-interest: (1) he visited his father and grandfather at the refinery itself several times; (2) he lived from 1954 to 1964 in a company-owned town, where asbestos drifted from the refinery; and (3) his father inadvertently brought asbestos from the refinery into the family home. The jury awarded

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts A, B, C, E and F of the Discussion.

[1] This action was originally filed by Lopez before his death and proceeded as a survivor action after his death.

plaintiffs $1,958,461 in economic damages and a total of $11 million in noneconomic damages.

In its appeal, Hillshire raises several challenges to the sufficiency of the evidence, the jury instructions given, and the failure of the jury to apportion any fault to the companies that manufactured asbestos used in the refinery. Plaintiffs, on cross-appeal, argue the court erred in granting Hillshire's motion for summary adjudication of their punitive damages claim. We affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

Since the 1920s, health and safety professionals have known that work with asbestos-containing products can cause asbestosis, a non-malignant scarring of the lung. In 1955, a link between asbestos and cancer was identified. California's safety orders were first promulgated in 1936 and applied to all places of employment in the state. At the times relevant to this case, they required employers to substitute substances creating harmful dust (including asbestos dust) when practicable, to control harmful exposures through ventilation and exhaust systems, to provide respirators as an emergency protection against brief exposures, to use water and other substances to prevent harmful exposures, to isolate dusty operations when their harmful effect could not be controlled by other means, to clean buildings and equipment that contribute to a hazard, and to provide showers and clothing storage for workers. (Former Cal. Admin. Code, tit. 8, §§ 4100, 4102, 4103, 4104, 4105, 4106, 4107, 4108, Register 18, No.8 (Dec. 19, 1949) pp. 432.145–432.150.) Asbestos concentration levels in the air could not exceed five million particles per cubic foot. (Former Cal. Admin. Code, tit. 8, § 4101(l).)

In the early 1970s, Congress enacted the Occupational Safety and Health Act (Fed/OSHA), which provides for the adoption of minimum national health and safety standards. (29 U.S.C. § 651.) In 1972, OSHA promulgated its first permanent asbestos regulations and recognized that concentrations that "may be safe with regard to asbestosis are not safe with regard to mesothelioma." The Federal Register stated, "No one has disputed that exposure to asbestos of high enough intensity and long enough duration is causally related to asbestosis and cancers." (37 Fed. Reg. 11318 (June 7, 1972).)

2

Asbestos concentration levels would be limited to a weighted average of five particles per cubic centimeter with a never-to-be-exceeded standard of ten particles per cubic centimeter; effective July 1, 1976, these levels would be reduced to two fibers per cubic centimeter, with a ceiling value of ten fibers per cubic centimeter. (*Ibid.*)[2]

By 1913, it was recognized that workers could take home toxic substances to which they were exposed. In 1960, a link between asbestos and mesothelioma was established for people who lived with an asbestos worker.

In the 1890s, the Union Sugar Company established a sugar refinery in Betteravia, California on the state's Central Coast. Hillshire is the successor-in-interest to Consolidated Foods Corporation, which acquired the Union Sugar Company in 1951. The sugar refinery was an enclosed building, measuring 50 by 130 feet, with no mechanical ventilation. The entrance to the machine shop was through two sliding doors that were eight to ten feet wide and eight to ten feet tall and opened into the main area of the refinery. Hillshire owned the surrounding "company town" of Betteravia, which had houses that Hillshire rented to its workers. The town also had an open air dump used by the refinery.

Hillshire used a great deal of asbestos insulation on miles of pipe located throughout the refinery, including a location just outside the machine shop. Asbestos was also used on thousands of valves, gaskets, packing materials and various pieces of equipment. The pipe insulation contained 15 to 20 percent asbestos and the gaskets and packing materials contained 70 to 80 percent asbestos.

Twice a year, for a combined total of three to five months, the refinery was shut down for repairs that included the inspection, repair and replacement of valves throughout the refinery. This work required the removal of large amounts of insulation and the replacement of packing and gaskets, and created visible dust. Ed Kealm, a longtime worker, recalled removing the insulation with a claw hammer in a way that

---

[2] There are two different methods of measuring asbestos in the air, particles per cubic foot of air (the Impinger method) and fibers per cubic centimeter of air (the membrane filter method).

produced "clouds of dust."  The doors to the machine shop were almost always open during shutdowns.  Asbestos scrap was put into the open air dump.  It was also put through an electric grinder outside the refinery.

Lopez's grandfather began working in the machine shop of the refinery in the 1920s and his father worked in the machine shop of the refinery beginning in the 1940s.  Lopez was born in 1954 and lived with his family in Betteravia in a total of three different houses near the refinery.  The family moved to nearby Santa Maria at the end of 1964, when the town closed down, but Lopez's father continued to work in the refinery.  Lopez lived in the family home in Santa Maria until he moved out at the end of 1972.

Hillshire workers often used compressed air to clean up debris and remove dust from their clothes.  Lopez's father always wore his work clothes home and they were sometimes dusty.  He sometimes did not change his clothes right away after returning home.  Lopez routinely helped his mother launder his father's work clothes because she had a damaged hand due to childhood polio.  After the family moved to Santa Maria, Lopez's father would drive to work in one of the family cars, which had cloth seats and in which Lopez frequently rode.

When he lived in Betteravia, Lopez played outside in the area, including in the open-air dump and on the dirt roads.  He routinely met his father and grandfather as they walked home from work in their work clothes.  Beginning at age seven (1961) he also sometimes visited his father and grandfather in the machine shop, primarily during shutdowns when it was easier to move about the refinery.  Lopez recalled that the refinery was a "very dusty environment" with "dust everywhere."  Lopez visited his father and grandfather about three to four times per week during shutdowns and the doors to the machine shop were almost always open to the main part of the refinery.  Lopez never wore a respirator and never saw any employee wearing one.

Lopez worked for United Parcel Service (UPS) from 1972 (when he moved out of the family home) until 1988.  From 1988 until 2004 or 2005, he owned his own Snap-On Tool franchise.  Then he went to work for Santa Maria Tire selling tires for heavy equipment.  He did not work with asbestos products in any of these jobs.  He did not do

4

any vehicle maintenance in any of these jobs, though when he worked for UPS he washed trucks on one side of a 120 by 80 foot warehouse where repairs were being done, including brake repairs. He recalled seeing brake dust but did not recall how often he saw it. He did not know how often brakes were changed on the trucks, and after 1975 he spent most of his time outside of the warehouse as a driver. Before leaving the family home at age 18, Lopez assisted his father or grandfather in replacing brake shoes on vehicles about 20 times. He does not recall there being dust because they applied some type of liquid to keep dust to a minimum.

In 1992, Lopez married Lannette Lopez and the couple had two children, Pilar and Seth. They were a very close family and Lopez participated in coaching, 4-H and leadership programs with his children. Lopez smoked socially in his 20s.

Lopez was diagnosed with mesothelioma in 2013 and was told his condition was terminal. He was given chemotherapy in the form of infusions to prolong his life for a couple of years. He stopped working and discontinued sports activities because he found it difficult to breathe. Mesothelioma can be linked to asbestos exposure about 70 percent of the time.

John Templin, plaintiffs' industrial hygiene expert, was asked about Hillshire's practices at the sugar refinery during Lopez's childhood. He testified that the use of compressed air spread asbestos throughout the sugar refinery and it would have migrated into the machine shop. The practice of grinding the asbestos insulation into powder was extremely hazardous and should not have been done, an opinion with which Hillshire's corporate representative agreed. Templin opined that the asbestos released during the grinding procedure went everywhere in Betteravia, including the dirt road in front of the refinery, the ball field and the houses.

According to Templin, visible dust signified asbestos in a concentration of over five million particles per cubic foot and as much as 100 million particles per cubic foot. Templin also believed that refinery workers such as Lopez's father would have gotten asbestos on their clothes and contaminated their homes. People who handle the worker's clothes have more asbestos exposure than others in the home.

5

Templin testified that during the 1950s it was recognized that only the complete elimination of asbestos would prevent the cancer it caused. Responsible companies at that time reduced exposure to asbestos to a level as low as was reasonably achievable. Between 1954 and 1973, Hillshire took no precautions at the refinery.

The defense, essentially, was that the dangerousness of asbestos and its proclivity to cause cancer was not fully appreciated until after Lopez had moved from the family home and the period where he was potentially exposed had ended, that Hillshire complied with the law in existence at the time, and that Lopez had not in any event proven he was ever exposed to asbestos under the various theories.

## II.  DISCUSSION

### A.  *Substantial Evidence of Exposure*

Hillshire argues the evidence was insufficient to prove either that Lopez was exposed to asbestos or that it caused him to be foreseeably at risk of harm. It cites the rule that " '[m]ere presence at a site where asbestos was present is insufficient to establish legally significant asbestos exposure.' " (*Petitpas v. Ford Motor Co.* (2017) 13 Cal.App.5th 261, 288 (*Petitpas*), citing *Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 252.) We disagree. Plaintiffs established more than Lopez's "mere presence" at a site where asbestos was present, and the judgment in their favor is supported by the evidence.

"In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, *and* must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury. . . .  [T]he plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's *risk* of developing cancer." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982–983, *Rutherford*).)

" 'Ultimately, the sufficiency of the evidence of causation will depend on the factual circumstances of each case.' [Citation.]  This is also true with respect to the

6

evidence of the exposure component of causation in asbestos litigation.  Mere speculation or conjecture about exposure to asbestos, however, is insufficient. . . .' " (*Casey v. Perini Corp.* (2012) 206 Cal.App.4th 1222, 1237.)  "Many factors are relevant in assessing the medical probability that an exposure contributed to plaintiff's asbestos disease," including "[f]requency of exposure, regularity of exposure, and proximity of the asbestos product to plaintiff." (*Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1416.)  "Additional factors may also be significant in individual cases, such as the type of asbestos product to which plaintiff was exposed, the type of injury suffered by plaintiff, and other possible sources of plaintiff's injury." (*Id.* at pp. 1416–1417.)  We review a jury's causation finding for substantial evidence. (*Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 969; *Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990, 997–999 (*John Crane*).)

Hillshire argues this case is similar to *Petitpas*, *supra*, 13 Cal.App.5th 261, in which a wife sued her husband's employer (among others) on direct—and secondary—exposure theories.  In that case, the wife's industrial hygienist testified that exposure could have occurred under certain hypothetical situations, but there was no evidence those situations had actually occurred. (*Id.* at pp. 279, 287–288.)  The husband may have visited job sites as a drafter for half an hour in the morning and then worked at an office before returning home; wife did not shake out the dust from his clothing, and her expert admitted there was no way to say with scientific certainty that husband had exposed wife in this fashion. (*Id.* at p. 288.)  Nonsuit was properly granted. (*Id.* at p. 290.)

In the case before us, the evidence of Lopez's asbestos exposure at Hillshire was far more substantial: (1) from 1954 to 1972, the relevant period in question, Hillshire used a great deal of asbestos insulation throughout the refinery on its pipes, on thousands of valves, and on various other pieces of equipment; (2) the pipe insulation contained 15 to 20 percent asbestos and the gaskets and packing contained 70 to 80 percent asbestos; (3) Lopez's father and grandfather worked primarily in the machine shop of the refinery, which was open to the plant; (4) Lopez lived near the refinery in Betteravia from his birth in 1954 until 1964; (5) Lopez often played around the refinery, in areas that included the

town dump where asbestos waste was deposited, and would frequently meet his father and grandfather at the refinery and walk home with them; (6) twice a year, for a period lasting a total of three to five months, Hillshire removed insulation containing asbestos during refinery shutdowns, which generated a high concentration of airborne asbestos and created visible dust ; (7) Lopez visited his father and grandfather several times a week during these shutdowns and saw "dust everywhere;" ; (8) old asbestos pipe insulation was recycled by feeding it through a grinder, which created a high concentration of dust and contaminated the area  (9) the town dump, where Lopez often played, was contaminated with large quantities of asbestos dust, and the dirt roads of Betteravia and the ball field were also contaminated  (10) Lopez's father always wore his work clothes home and Lopez helped his mother launder his clothes; and (11) the safety orders in force at the time allowed airborne asbestos in concentrations of no more than five million particles per cubic foot; visible asbestos dust exceeds this limit and could reflect as much as 100 million particles per cubic foot.

A jury could reasonably find evidence of exposure, both direct and secondary, from this evidence.

B. *Lopez Was Foreseeably at Risk*

Hillshire argues that the judgment must be reversed because Lopez was not foreseeably at risk of harm.  It argues that plaintiffs failed to prove there was a breach of any duty owned to Lopez, who was not a worker at the sugar refinery.  We disagree.

The general duty to use ordinary care in the conduct of one's activities applies to the use of asbestos on a property owner's premises.  (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1144 (*Kesner*).)  This duty extends not only to those persons who are exposed to asbestos directly by a property owner's activities, but also to members of a workers' immediate household in cases of take-home exposure.  (*Id*. at pp. 1144–1145.) Duty is a legal question determined by the court.  (*Id*. at p. 1144.)  Negligence need not be directed toward a plaintiff specifically for a defendant to be liable; it is enough that he is a member of a class of persons to which a duty is owed.  (*Id*. at pp. 1154–1155; Rest.2d Torts, §§ 281(b), 430(1).)

8

Lopez was a visitor to the refinery and lived in Betteravia, making it foreseeable that he would be directly affected by any negligence in the handling of asbestos in and around the refinery. He was a member of a refinery worker's household, making it foreseeable he would be injured by any secondary, take-home exposure, (*Kesner, supra,* 1 Cal.5th at p. 1154–1155.) The trial court did not err in concluding Hillshire owed Lopez a duty; what was at issue was whether Lopez was injured by Hillshire's activities. The jury concluded he was, and as we have explained, that finding is supported by substantial evidence.

C. *Negligence Per Se Instructions*

Hillshire argues that the trial court committed prejudicial error when it instructed on the theory of negligence per se. We disagree.

" 'Negligence per se' is an evidentiary doctrine codified at Evidence Code section 669. Under subdivision (a) of this section, the doctrine creates a presumption of negligence if four elements are established: (1) the defendant violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted. [Citation.] These latter two elements are determined by the court as a matter of law." (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1285.)

The trial court instructed the jury on negligence per se with a version of CACI No. 418, which advised the jury, "California's General Safety Orders required from at least 1954 through 1964 that employers prevent harmful exposure to asbestos in places of employment. Relevant portions of these laws are provided starting on the page immediately following this instruction and in Trial Exhibit 1. [¶] The Hillshire Brands Company was an employer. [¶] 'Place of employment' means any place, and the related land and buildings, where employment is carried on. [¶] 'Employment' means carrying on of any trade, industry, business, or work, including any process or operation in any

9

way related thereto.  [¶]   If you decide [¶] 1.  That The Hillshire Brands Company violated any of these laws and [¶] 2.  That the violation(s) was(were) a substantial factor in bringing about the harm to Mark Lopez, then you must find that The Hillshire Brands Company was negligent.  [¶]  If you find that The Hillshire Brands Company did not violate these laws or that the violation(s) was(were) not a substantial factor in bringing about the harm, then you must still decide whether The Hillshire Brands Company was negligent in light of the other instructions."  The instruction goes on to state the text of several safety orders.  (Former Cal. Admin. Code, tit. 8, §§ 4100, 4101, 4102, 4103, 4106, 4107, 4108, Register 55, No.2 (Jan. 22, 1955) pp. 431–432.169.)

Had Lopez been an employee of Hillshire, his mesothelioma was clearly of the type the asbestos-related safety orders were designed to prevent, and it was a question of fact as to whether the safety orders were in fact violated and whether any violation was a substantial factor in causing Lopez's illness.  Hillshire focuses on the final factor of negligence per se, and argues that because Lopez did not work for Hillshire as an employee, he was not part of the class of people the safety orders were designed to protect.  Effectively, Hillshire argues that the violation of a safety order cannot be the basis of liability on a negligence per se theory in an action brought by a nonemployee.  We are not persuaded.

In *Porter v. Montgomery Ward & Co., Inc.* (1957) 48 Cal.2d 846, 847–849 (*Porter*), a retail customer who was injured when falling down stairs in a department store obtained a negligence per se instruction based on the violation of a safety order requiring that stairways of 88 inches or more be equipped with a center railing.  The court specifically rejected an argument that the safety order was inadmissible and the negligence per se instruction should not have been given because the order governed only employer-employee relationships and could not be applied to members of the general public.  (*Id.* at pp. 847–848.)  The court followed a series of cases in which the violation of safety orders was used to establish negligence to someone other than an employee: "Defendant attempts to distinguish the foregoing cases from the present one on the ground that the plaintiffs there, although not employed by the defendants, were

10

employees of third parties and were acting in the course of such employment.  However, the fact that the persons injured were employed by someone is not made the basis of any of those decisions, and, to the contrary, [two of the] cases rest expressly on the conclusion that the plaintiffs were protected as members of the general public.  [A] distinction between a person who enters a department store at the direction of his employer and one who comes there for the same purpose on his own initiative would be unreasonable and productive of anomalous results.  Such a distinction would mean, for example, that the stairway safety order would apply to a secretary entering defendant's store on a shopping errand for her employer but that it would not protect her if she went there during her lunch hour to make a purchase for herself, even though the store's relationship to her would be identical in both instances." (*Id*. at p. 849.)

The *Porter* court recognized that "[s]ome safety orders, such as those regulating machinery, might be regarded as peculiarly designed to protect employees when applied to places of employment which the public is prohibited from entering.  An entirely different situation, however, is presented where, as here, a person is a business invitee in a department store and is using a stairway which the store provides for persons in her position as well as for employees.  Plaintiff was entitled to the benefits of the safety order under the circumstances." (*Porter*, *supra*, 48 Cal.2d at p. 849.)

In this case, the plaintiffs' theory was that Lopez was exposed to asbestos because (1) he frequently visited his father and grandfather at the plant itself as he was authorized to do; (2) he lived for about ten years as a child in the immediate vicinity of the sugar refinery, and asbestos drifted from the refinery; and (3) he lived in the same household as his father and helped his mother launder his father's asbestos-covered clothing.  Lopez was not prohibited from the activities giving rise to the exposure,[3] and there is no reason to limit the use of the safety orders when their violation could expose nonemployees as

---

[3] At trial, Hillshire disputed that Lopez actually visited the refinery and presented evidence that children were not allowed on refinery premises except when tours of the factory were given.  For purposes of this appeal, Hillshire does not dispute Lopez's testimony that he visited the refinery.

11

well as employees to harmful levels of asbestos. (See also *Cappa v. Oscar C. Holmes, Inc.* (1972) 25 Cal.App.3d 978, 981–982 [although the primary purpose of safety order was the protection of workers, "it has consistently been held, at least where the safety order does not indicate the contrary, that persons consensually on the premises to which a safety order applies also come within its protection."].)

Moreover, in 1999, Labor Code section 6304.5 was substantially amended and now provides in relevant part: "Sections 452 and 669 of the Evidence Code shall apply to this division and to occupational safety and health standards adopted under this division in the same manner as any other statute, ordinance, or regulation." (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 923, 926–927 (*Elsner*).) Under the statute as originally enacted in 1971, safety orders were not admissible except in workers' compensation actions by employees against employers, thus creating "an exception to the long-standing common law rule, codified in Evidence Code section 669, that statutes may be admitted to establish a standard or duty of care in negligence actions." (*Elsner, supra*, at p. 923.) Now, Cal-OSHA provisions and safety orders "are to be treated like any other statute or regulation and may be admitted to establish a standard or duty of care in all negligence and wrongful death actions, including third party actions." (*Id.* at p. 928.)

In *Elsner*, *supra*, 34 Cal.4th at page 924–925, plaintiff was an employee of a subcontractor and was injured on the job in a fall from faulty scaffolding built under the supervision of the worksite's general contractor. In a subsequent negligence action, the general contractor sought to exclude "references to Cal–OSHA provisions and their alleged violation" on the grounds that Labor Code section 6304.5 made them "inadmissible for any purpose in an employee's third party action." (*Id.* at p. 924.) The Supreme Court held that under the amended version of the statute, "plaintiffs may use Cal–OSHA provisions to show a duty or standard of care to the same extent as any other regulation or statute, whether the defendant is their employer or a third party. The lone exception arises when the state is the defendant based on actions it took or failed to take in its regulatory capacity; in such cases, Cal–OSHA provisions remain inadmissible to show liability based on breach of the statutory duty to inspect worksites and enforce

12

safety rules." (*Id.* at pp. 935–936.) Although *Elsner* involved a worker's action for jobsite injuries against a third party, Hillshire offers no compelling argument as to why its holding is not equally applicable to a negligence action by a nonworker who is lawfully on the premises.

At oral argument, Hillshire clarified that it was not advocating a categorical rule that precluded using the violation of safety orders to establish negligence per se toward nonemployees. Rather, it argues that in this case, the safety orders established that asbestos air concentrations of anything less than five million particles per cubic foot were considered safe for both employees and nonemployees. Hillshire claims the safety orders were not intended to apply to anyone who was exposed to asbestos within "safe" limits, and the evidence did not support a determination that Lopez was ever exposed to asbestos in concentrations that exceeded five million particles per cubic foot, even if some of Hillshire's employees were exposed to greater concentrations. Hillshire argues that Lopez, consequently, was not of the class the safety order was designed to protect, and that his injuries (caused by exposure to less than five million particles per cubic foot) were not of the sort the safety orders were designed to prevent.

Preliminarily, we do not agree that the evidence shows Lopez was never exposed to asbestos exceeding five million particles per cubic foot. This is what Hillshire's expert in industrial hygiene, Benjamin Heckman, testified to. But plaintiffs' industrial hygiene expert, John Templin, testified that the presence of visible dust showed concentration levels between five and 100 million parts per cubic foot. Lopez testified in his deposition that when he visited his father and grandfather at the refinery it was "a very dusty" environment with "dust everywhere." The jury could reasonably infer that Lopez was exposed to asbestos concentrations exceeding that allowed in the safety orders.

Even if Lopez's disease was caused by exposures that did not exceed five million parts per cubic foot, this does not mean he was outside the class of individuals the safety orders were intended to protect. "The presumption of negligence created by Evidence Code section 669 concerns the *standard* of care, rather than the *duty* of care." (*Rosales v. City of Los Angeles* (2000) 82 Cal.App.4th 419, 430.) Hillshire could only be liable

13

under a negligence per se theory if they violated the orders, and allowed concentration levels exceeding five million parts per square foot. It is appropriate to impute negligence to Hillshire under such circumstances, even if Lopez's mesothelioma was caused by exposure to lesser concentrations of asbestos.

Nor do we agree that an injury caused by exposure to asbestos in a concentration of anything less than five million parts per cubic foot is an occurrence the safety orders were not designed to prevent. The safety orders concerned "Dusts, Fumes, Mists, Vapors, Gases," and set the maximum acceptable concentrations for such substances, including asbestos. An injury caused by exposure to asbestos, whenever it was present in amounts greater than the maximum allowable concentration, was of a type contemplated by the safety order, even if the concentration level was less at the point of exposure. Plaintiffs were required to show that a violation of the safety orders was the cause of Lopez's injury before they could recover under a theory of negligence per se; this is enough to ensure that Hillshire will not be held liable to Lopez for its negligence toward others.

D. *CACI No. 435*

The trial court gave a modified version of CACI No. 435 regarding causation: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It does not have to be the only cause of the harm. [¶] Plaintiffs may prove that exposure to asbestos from The Hillshire Brands Company's property or operation was a substantial factor causing Mark Lopez's illness by showing, through expert testimony, that there is a reasonable medical probability that the exposure was a substantial factor contributing to his risk of developing cancer."

Hillshire contends the court should have instructed the jury with CACI No. 430, the more general instruction on substantial-factor causation: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." Hillshire argues that CACI No. 435

14

was intended to apply only when a negligence claim is asserted against a manufacturer or supplier, and contends CACI No. 430 remains the appropriate instruction when the defendant is an employer/premises owner rather than a manufacturer or supplier.[4] We disagree.

Both CACI No. 430 and CACI No. 435 define causation using the "substantial factor" test and specify that the question to ask is whether a "reasonable person" would consider that factor as having contributed to the harm. Both instructions clarify that a substantial factor does not have to be the only cause of the harm. The primary difference between the two instructions is (1) CACI No. 430 specifies that a substantial factor must be more than "remote or trivial;" (2) CACI No. 430's final, bracketed paragraph states the so-called "but-for" test, under which conduct is not a substantial factor if the same harm would have occurred without it; and (3) CACI No. 435 specifies that asbestos exposure will be deemed a substantial factor in causing an illness when there is a reasonable probability the exposure was a substantial factor contributing to the *risk* of developing cancer, consistent with the rule set forth by our Supreme Court that it is not necessary to prove that "fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth." (*Rutherford*, *supra*, 16 Cal.4th at p. 982.)

CACI No. 435 is based on the court's decision in *Rutherford*, *supra*, 16 Cal.4th at pages 982 to 983, and "is to be given in a case in which the plaintiff's claim is that he or she contracted an asbestos-related disease from exposure to the defendant's asbestos-containing product." (CACI No. 435, Directions for Use.) The Directions for Use note for CACI No. 435 states, "Whether the same causation standards from *Rutherford* would

---

[4] Plaintiffs argue that Hillshire invited any error in failing to give the last, bracketed paragraph of CACI No. 430 because although it included the complete instruction in its request for instructions filed March 27, 2017, it filed a trial brief on August 14, 2017, in which it requested that both CACI No. 430 and CACI No. 435 be given and quoted CACI No. 430's first paragraph only. We agree with Hillshire that the trial brief was quoting CACI No. 430 simply for reference. We find no invited error or waiver of its claim that the last, bracketed paragraph of CACI No. 430 should have been given.

apply to defendants who are alleged to have created exposure to asbestos but are not manufacturers or suppliers of asbestos-containing products is not settled." In *Petitpas*, *supra*, 13 Cal.App.5th at pages 299 to 300, the court approved the causation instructions (or alternatively found any error harmless) when the trial court in an asbestos case involving both manufacturers/suppliers and premises owners/employers gave both CACI No. 430 and 435. But the version of CACI No. 430 given in *Petitpas* did not contain the final, bracketed paragraph setting forth the "but-for" standard and the court in that case did not decide whether it would be error to give CACI No. 435 alone; the question was whether it was error to give CACI No. 430 in addition to CACI No. 435. (*Id.* at pp. 298–299.) Squarely faced with the issue of CACI No. 435's correctness for a non-manufacturer/non-supplier, we conclude that CACI No. 435 applied to plaintiffs' asbestos-related claim, even though Hillshire is not a manufacturer or supplier of asbestos.

CACI No. 435 was developed to address the special considerations that apply when the injury was allegedly caused by asbestos exposure. These include the long latency period, the occupational settings that often expose workers to multiple forms and brands of asbestos, and, in a case of exposure to asbestos from multiple sources, the difficulty of proving that a plaintiff's or decedent's illness was caused by particular asbestos fibers traceable to the defendant. (See *Major v. R.J. Reynolds Tobacco Co.* (2017) 14 Cal.App.5th 1179, 1196 (*Major*).) These considerations are similar whether the defendant was a manufacturer/supplier or otherwise created the exposure to asbestos.

Additionally, giving CACI No. 430, which states that a factor is not substantial when it is "remote or trivial," could be misleading in an asbestos case, where the long latency period necessitates exposures will have been several years earlier. Jury instructions therefore should not suggest that a long latency period, in which the exposure was temporally "remote," precludes an otherwise sufficient asbestos claim. " 'Remote' often connotes a time limitation. Nothing in *Rutherford* suggests such a limitation; indeed, asbestos cases are brought long after exposure due to the long-term latent nature

16

of asbestos-related diseases." (CACI No. 430, Directions for Use (2019 ed.) p. 284.) It was not error for the court to give CACI No. 435 alone instead of CACI No. 430.

Giving CACI No. 430 in its entirety also would have meant instructing the jury on the principle of "but-for" causation. Although generally subsumed within the substantial factor test, "the but-for test is inappropriate in cases when two forces are actively operating and each is sufficient to bring about the harm." (*Major*, *supra*, 14 Cal.App.5th at p. 1196, citing *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1235.) "If a plaintiff [or decedent] has developed a disease after having been exposed to multiple defendants' asbestos products, medical science [is] unable to determine which defendant's product included the specific fibers that caused the plaintiff's [or decedent's] disease." (*Major* at p. 1196.) A "but-for" instruction is therefore inappropriate in the asbestos context, at least when there are multiple sources of exposure. (See *John Crane, supra,*. 132 Cal.App.4th at p. 998, fn. 3.) Although Hillshire was the only defendant in this case, there was evidence that Lopez had been exposed to asbestos at other junctures in his life, and it would be inaccurate to tell the jury that Hillshire was absolved of liability if one of these other exposures was also a cause of his mesothelioma.

Hillshire argues that an instruction on but-for causation was required in this case because the jury received an instruction on negligence per se based on Hillshire's alleged violation of the applicable safety orders. Hillshire reasons the "but-for" test was "especially critical" because the negligence per se doctrine does not apply if compliance with the law at issue would not have prevented the harm (i.e., the harm would have occurred regardless of compliance with the law). (See *Capolungo v. Bondi* (1986) 179 Cal.App.3d 346, 353–355 [when driver violated parking ordinance by remaining in loading zone too long, bicyclist who was injured when she swerved into traffic to avoid parked car was not entitled to negligence per se instruction because among other things, length of time car was parked in yellow zone had no causal connection to accident].)

We have previously found no error in giving a negligence per se instruction. And regardless of the propriety of that instruction, it did not render CACI No. 430 rather than CACI No. 435 the proper instruction on the issue of causation. The negligence per se

17

instruction in this case was a version of CACI No. 418, and advised the jury in relevant part, "California's General Safety Orders required from at least 1954 through 1964 that employers prevent harmful exposure to asbestos in places of employment. [¶] . . . [¶] If you decide [¶] 1. That The Hillshire Brands Company violated any of these laws and [¶] 2. That the violation(s) was(were) a substantial factor in bringing about the harm to Mark Lopez, then you must find that The Hillshire Brands Company was negligent. [¶] If you find that The Hillshire Brands Company did not violate these laws or that the violation(s) was(were) not a substantial factor in bringing about the harm, then you must still decide whether The Hillshire Brands Company was negligent in light of the other instructions." The jury would have understood that the negligence per se instruction did not apply if the violation of the safety orders did not cause the harm—if, in other words, that the harm would have occurred even without the violation.

Hillshire argues that CACI No. 435 combined with the negligence per se instruction allowed the plaintiffs to proceed on a "disconnected" theory, allowing them to prove negligence by showing Hillshire was negligent toward people other than Lopez. (See *Capulungo*, *supra*, 179 Cal.App.3d at p. 350 [person must be of the class for whose protection the ordinance was adopted].) Nothing in the causation instruction relieved plaintiffs of their burden of proving Hillshire was negligent toward Lopez; if the violation of the ordinance was not a substantial factor in causing Lopez's injuries, negligence per se would not apply.

Hillshire also complains that CACI No. 435 did not specify that conduct must be negligent to be a substantial factor in causing harm. But CACI No. 435 was a causation instruction; the jury was elsewhere instructed on negligence principles.

E. *Apportionment of Fault*

The jury was instructed on strict liability design, failure to warn and negligence as to four manufacturers of asbestos who were not defendants at trial but whose products were found at the Hillshire refinery: Johns-Mansville, Fibreboard/Pabco, Anchor Packing and Garlock. The jury found them to be zero percent at fault and Hillshire to be 100 percent at fault in causing Lopez's injuries. Hillshire argues a new trial is required on the

issue of apportionment because the jury found it 100 percent liable despite overwhelming evidence of the various manufacturers'' liability. We disagree.

"In an action for wrongful death, each defendant's liability for a plaintiff's noneconomic damages is several only, and each defendant is liable only for the percentage of noneconomic damages that corresponds to its proportionate share of fault. (Civil Code, § 1431.2, subd. (a).) A defendant accordingly may reduce its own comparative fault by pointing the finger at other tortfeasors, including those who are not party to the case. [Citation.] 'The comparative fault doctrine "is designed to permit the trier of fact to consider all relevant criteria in apportioning liability. The doctrine 'is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an 'equitable apportionment or allocation of loss." ' [Citation.]' [Citation.] The defendant bears the burden of establishing that some nonzero percentage of fault is properly attributable to other entities. [Citation.] *A defendant seeking apportionment of fault in an asbestos case accordingly must demonstrate that the asbestos from a particular product or source ' "was a substantial factor contributing to the . . . [plaintiff's] risk of developing cancer." ' "* (*Soto v. BorgWarner Morse TEC Inc.* (2015) 239 Cal.App.4th 165, 202 (*Soto*), italics added.)

"We review the jury's allocation of fault for substantial evidence. [Citation.] That means that we ' "consider the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference and resolving conflicts in support of the judgment. [Citation.]" [Citation.]' [Citation.] We may not substitute our own judgment for that of the jury or set aside the jury's findings if the record contains any evidence which under any reasonable view supports the jury's apportionment. [Citation.] Additionally, as always, 'we start with the presumption that the record contains evidence sufficient to support the judgment. It is the appellant's affirmative burden to demonstrate otherwise.' [Citation.] Under these standards, 'courts rarely

19

disturb the jury's apportionment of fault.' " (*Soto*, *supra*, 239 Cal.App.4th at pp. 202–203.)

As plaintiffs point out, Hillshire spent little time at trial presenting evidence that other parties in particular were at fault.  And the bulk of plaintiffs' evidence was that while asbestos was a intrinsically dangerous substance, the real problem was Hillshire's use of the product, particularly during the shut-down periods, which included spreading it out over the refinery by allowing workers to remove the existing insulation from the pipes, by having workers use air compressors to blow off their clothing, and by putting the used asbestos insulation through a grinder.  Though various witnesses confirmed that products by the four manufacturers were used by Hillshire, the record contains no evidence quantifying Lopez's exposure from those sources.  (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1286 [70 percent apportionment of fault toward supplier upheld when record disclosed no evidence quantifying plaintiff's exposure to asbestos from other sources].)  The jury was instructed that to allocate fault to manufacturers based on either products liability or failure to warn, it had to find they were substantial factors in causing the harm.  (*Ibid.*; *Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 477–479 [jury found defendant's asbestos-based product was sole cause-in-fact of plaintiff's mesothelioma when defendant submitted no evidence regarding extent of exposure to other manufacturers' products].)[5]  We will not on this record disrupt the jury's allocation of fault.

F.  *Punitive Damages*

The trial court denied a motion for summary judgment brought by Hillshire but granted summary adjudication in Hillshire's favor regarding plaintiffs' claim for punitive

---

[5] Hillshire suggests the jury never reached the question of whether the four manufacturers' products were a substantial factor in causing Lopez's injuries because the verdict was a "special verdict" in which jurors returned a finding of no fault and did not reach the issue of causation   The instructions, however, advised the jury that in order to find Lopez was harmed by the asbestos manufactured by the listed companies, it must find the failure of the product to perform safely, their failure to warn or and/or their negligence was a substantial factor in causing his harm.

damages.  In their cross-appeal, plaintiffs argue this ruling was erroneous and they should have been allowed to proceed to trial on their punitive damages claim.  (See *Tran v. Farmers Group, Inc.* (2002) 104 Cal.App.4th 1202, 1206, fn. 1 [order granting summary adjudication reviewable upon entry of final judgment after jury trial].)  We disagree.

In a civil case not arising from the breach of a contractual obligation, the jury may award punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  (Civ. Code, § 3294, subd. (a).)  Although the " 'clear and convincing' " standard is stringent, it does not require a plaintiff to "prove" a case for punitive damage at the summary judgment or adjudication stage.  (*American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1049 (*American Airlines*).)  But because the ultimate burden of proof will be by clear and convincing evidence, that higher standard should be taken into account when ruling on a motion for summary judgment or summary adjudication.  (*Basich v. Allstate Ins. Co.* (2001) 87 Cal.App.4th 1112, 1118 (*Basich*).)

" 'Malice' is defined as intentional injury or "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."  (*Id*., § 3294, subd. (c)(1).)  "Oppression" is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  (*Id*., § 3294, subd. (c)(2).)'  [Citation.]  The term 'despicable' is not defined in the statute, but the Supreme Court has observed that it is applicable to 'circumstances that are "base," "vile," or "contemptible." '  [Citation.]"  (*Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123, 164 (*Wilson*).)  " 'Despicable conduct" has been described as conduct which is ' ". . . so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." ' "  (*American Airlines*, *supra*, 96 Cal.App.4th at p. 1050.)

Civil Code section 3294, subdivision (b) provides: "An employer shall not be liable for [punitive] damages . . . , based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or

21

authorized or ratified the wrongful conduct . . . . With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, [or] ratification . . . must be on the part of an officer, director, or managing agent of the corporation." Thus, "[w]hen the defendant is a corporation, '[a]n award of punitive damages against a corporation . . . must rest on the malice of the corporation's employees. [¶] But the law does not impute every employee's malice to the corporation.' [Citation.] Instead, the oppression, fraud, or malice must be perpetrated, authorized, or knowingly ratified by an officer, director, or managing agent of the corporation. (Civ. Code, § 3294, subd. (b).) ' "[M]anaging agent" . . . include[s] only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy.' [Citation.]" (*Wilson*, *supra*, 234 Cal.App.4th at p. 164; see *White v. Ultramar* (1999) 21 Cal.4th 563, 576–577.) The California Supreme Court has clarified that persons having "discretionary authority over . . . corporate policy" refers to "formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 714–715.)

During the years relevant to this case (1954–1972), the refinery was owed by Consolidated Foods Corporation, previously known as Consolidated Grocer's Corporation, which was headquartered in Chicago. The company then became known as the Sara Lee Corporation, and is currently known as The Hillshire Brands Company. Plaintiffs conceded in their opposition to the motion for summary adjudication that the evidence showed the managers and workers at the refinery in Betteravia were unaware of the hazards of asbestos before 1972. They argue this does not establish what Hillshire knew for purposes of punitive damages. But while they argue that Hillshire was a "large" company "with operations around the country and world," they made no showing that any of the policy-makers in Chicago were aware of asbestos at the sugar refinery during the relevant period, or that anyone of sufficiently responsible status at Betteravia appreciated the risks, particularly with respect to family members of workers who were not regularly present in the sugar refinery. Criticisms of Hillshire's practices during the

22

time in question do not raise a triable issue of fact as to clear and convincing proof of malice.  (*Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1172; *Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 168 ["not a hint" that store supervisor "exercised authority over corporate principles or rules of general application in the corporation;" jury's award of punitive damages reversed].)

Plaintiffs argue that managerial employees at the sugar refinery knew that asbestos posed a cancer risk once OSHA was established in May of 1971, and that Lopez did not move out of the family home until the end of 1972.  They argue that during this period, those employees knew of the risks, yet precautions were not taken and indeed, Hillshire did not comply with OSHA until the 1980s.  They argue that plant manager Alan Hutsinpiller testified that Hillshire "did not do the asbestos testing in 1972 mandated by OSHA" because it did not want to "open a can of worms" or go "looking for trouble." Without in any way minimizing the importance of OSHA compliance, we read Hutsinpiller's testimony to be that post-OSHA, while refinery employees did not disturb insulation that was encapsulated to see if it contained asbestos, if insulation did have to be removed, they applied a "match test" to determine whether it contained asbestos before doing so.[6]  Whether or not this complied with OSHA, it is not evidence of despicable conduct on the part of a managing agent of Hillshire that would support an award of punitive damages.

Plaintiffs rely on the decision in *Pfeifer*, *supra*, 220 Cal.App.4th at page 1299 to support its argument that the evidence supporting punitive damages in this case was sufficient to withstand summary adjudication.  In that case, a gasket manufacturer learned in 1970 that handling asbestos was hazardous and in 1972 acted to protect its own employees, yet it failed to warn its customers about the risk until 1983.  (*Id*. at pp.

---

[6] Hutsinpiller described the "match test" as follows:  "[I]f anybody, you know, came in contact or we had to do anything with any kind of insulation, the mechanical department, myself, other people would do a simple little match test.  You take a little piece of dust and apply a match to it.  If it had that glow, it had [asbestos] in it."  He "couldn't say" whether this match test was done before OSHA.

23

1300–1301.) This actual knowledge was deemed sufficient to support punitive damages. Plaintiffs also rely on *Johnson & Johnson v. Superior Court* (2011) 192 Cal.App.4th 757, 762–767, in which the court denied a pretrial writ brought by a drug manufacturer on a motion denying summary adjudication of punitive damages in a negligence and strict products liability action. Plaintiff had a severe adverse reaction to an over-the-counter drug; at issue was whether the drug manufacturer had placed an adequate warning on the label. It was undisputed the manufacturer understood the risk; its argument was rather that the label complied with Federal Drug Administration requirements. (*Id.* at. pp. 760–761.) This was held insufficient to relieve the drug manufacturer of punitive damages liability for failure to warn of a known risk.

The cases relied upon by plaintiff differ from the case before us because the defendants knew of the risk that gave rise to (potential) liability. In this case, by contrast, we agree with the trial court, which found "plaintiffs cited no evidence that Hillshire knowingly subjected its employees to working condition[s] where they were exposed to asbestos while possessing actual knowledge of the risks of asbestos during the relevant time frame. To further emphasize, there is no evidence showing that defendant knew of the hazards of asbestos and either concealed the information or chose not to warn their end users. [¶] The court has reviewed the deposition of Mr. Pardue, Hillshire's person most knowledgeable, and there is no evidence that Hillshire had actual knowledge of asbestos at Union Sugar Plant. (See Pardue deposition 37:30-32 and 232 1-21.) [¶] While plaintiff[s] may well have shown facts that support a finding of negligence, even gross negligence, such a showing does not suffice to establish malice. Stated another way, if plaintiffs had successfully shown that Hillshire was aware of the safety regulations regarding asbestos, there is no evidence showing that they knew that their own conduct would cause or was causing harm; therefore, the motion must be granted."

Pardue, the "person most knowledgeable" referred to by the trial court, testified in his deposition that in about 1969, ". . . the general information on the part of the public was asbestos was, not—the hazards of asbestos was not known in general. It was perhaps something that came across management's desk and they became aware of it. [¶] What

24

to do about it was still uncertain because the regulations I think by that time were not specific. And I don't know that they knew about the potential hazards of using it and how it became a hazard." Asked when the management at the sugar refinery became aware of the potential risks of asbestos, he did not know the exact date, but estimated it to be in the late 1960s or early 1970s, but did not know if it was before 1972. He wasn't aware of whether Union Sugar was aware of the health hazards of asbestos in 1951 (when Hillshire's predecessor-in-interest bought the sugar refinery). Information about asbestos was beginning to form between 1951 and 1972, but he didn't know if the sugar refinery manager knew about it. Asked whether the refinery should communicate with workers about the latent disease process of asbestos, he stated, "I doubt even if the management knew about the particulars about latency and the mode and by which asbestos caused the cancer. [¶] There was some knowledge at professional levels, but I doubt if it was very well known among plant managers who were not skilled in those areas." Pardue acknowledged the company knew of the latent disease process of asbestos in 1971 because of OSHA. Procedures were put in place in 1971 so that only the paint crew would handle asbestos at the refinery. Pardue acknowledged that *if* Hillshire (then Consolidated Foods) learned asbestos was potentially dangerous, it should have made sure its separate operating divisions new about it.

All of this testimony supports an argument that Hillshire *should* have known that asbestos was present at the sugar refinery and posed risks to its workers sometime before the end of 1972. What it did *not* do was show that decision-makers at Hillshire knew about the presence of asbestos at the sugar refinery at the relevant times, and allowed them to handle it despite the risks. Even less does it show that Hillshire appreciated there was a risk from asbestos to persons who lived in Betteravia and sometimes visited the plant prior to 1964, or that it actually understood after 1964 that there was a risk posed to

25

persons who did not work for the plant and who did not live near the sugar refinery, and whose only connection to the plant was that they lived with someone who worked there.[7]

Plaintiffs argue that Hillshire, as the party moving for summary adjudication, failed to carry its initial burden of showing plaintiff does not possess and cannot reasonably obtain, needed evidence to show "one or more of the elements. . . cannot be established . . . ." (Code Civ. Proc., § 437c, subds. (o)(1), (p)(2); *Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 805.)  The evidence presented by Hillshire showed a lack of actual knowledge sufficient to show malice, fraud or oppression; the trial court was not required to explicitly walk through the burden-shifting analysis for summary judgment. (See *Basich*, *supra*, 87 Cal.App.4th at p. 1118.)  Summary adjudication was properly granted on punitive damages.  (*Id.* at 1121.)

### III.  DISPOSITION

The judgment is affirmed.  Because each party prevailed in defending the aspect of the judgment in its favor against the other party, it is in the interests of justice that the parties shall bear their own costs.  (Cal. Rules of Court, rule 8.278(a)(5).)

---

[7] 1964 is the year Lopez moved with his family from Betteravia to Santa Maria. Lopez's testimony that he visited his father and grandfather at the sugar refinery, and that he played outside in the area near the refinery, concerned the period when he lived in Betteravia.  After 1964, any asbestos exposure attributable to Hillshire was secondary exposure resulting from asbestos brought home on the clothing of Lopez's father.

_____

NEEDHAM, J.

We concur.

_____

SIMONS, Acting P. J.

_____

BURNS, J.

*Lopez v. Hillshire Brands Co. /* A152887

A152887 / Lopez v. Hillshire Brands Co.

Trial Court:   Superior Court of Alameda County

Trial Judge:   Honorable Brad Seligman

Counsel:      Kaiser Gornick; Jeffrey Alan Kaiser, Lawrence J. Gornick, David Markevitch; The Arkin Law Firm; Sharon Joellen Arkin for Plaintiffs.

Sidley Austin; David R. Carpenter, Mark Edmonde Haddad, Jean-Claude Andre, Andrew B. Talai; Buty & Curliano; Jason John Curliano & Michael C. Guasco for Defendants.